**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 91-1472
_____

UNITED STATES of AMERICA,

Plaintiff-Appellee,

VERSUS

JOHN SENNETT WHITE and
JOHN MICHAEL WILSON,

Defendants-Appellants.

_____

Appeals from the United States District Court
For the Northern District of Texas
_____

(September 4, 1992)

Before HILL[1], KING and DAVIS, Circuit Judges.

DAVIS, Circuit Judge:

John Sennett White and John Michael Wilson appeal their convictions on charges of possession with intent to distribute cocaine and conspiracy to commit the same offense on several grounds. Both challenge their convictions and Wilson contests his sentence under the Guidelines. For both defendants, we reverse in part, affirm in part and remand for entry of a new judgment and for resentencing.

**I.**

In the fall of 1989, a federal grand jury in the Southern District of Texas returned an indictment against Mark Monroe

---

[1] Senior Circuit Judge of the Eleventh Circuit, sitting by designation.

Northcutt (Northcutt) charging him with possession of cocaine with intent to distribute and conspiring to commit the same offense in violation of 21 U.S.C. §§ 841(a)(1) and 846. Northcutt was also facing state felony drug charges in San Marcos, Texas, as well as state forfeiture proceedings against his property. In January of 1990, Northcutt agreed to cooperate with the Drug Enforcement Administration (DEA) and identified several targets for federal prosecution. One of those targets is a defendant in this case, John Michael Wilson (Wilson). Wilson was a criminal defense attorney practicing in Dallas who handled mostly drug cases.

At an initial unrecorded meeting, Northcutt met with Wilson at Wilson's office in Dallas. Northcutt asked Wilson to defend him in the cases described above. According to Northcutt, Wilson quizzed him about the extent and profitability of his drug distribution business. Northcutt met a second time with Wilson in Houston on February 27, 1990. In this meeting, which was tape recorded, Northcutt told Wilson that he wanted to hire him but didn't have any cash. Northcutt told Wilson that he had twenty-one kilograms of cocaine stored in a mini-warehouse and asked Wilson for an introduction to one of his clients who might be interested in purchasing the cocaine. Wilson responded that if he furnished such an introduction, he would be implicated in the conspiracy which he did not want to do. Wilson agreed, however, to consider the proposal. John Sennett White (White), who was both Wilson's client and personal cocaine supplier, left at least nine telephone messages for Wilson during the week following this meeting.

The next contact with Wilson occurred when Wilson called

2

Northcutt on March 8, 1990. Wilson told Northcutt that he had "somebody in Dallas that might be interested" in the cocaine. Later the same day, Wilson and Northcutt discussed over the phone whether the cocaine transfer should be made in Dallas, Houston (where Northcutt was) or somewhere between the two cities. Wilson mentioned "his man" in relation to the transaction. Wilson was agreed to travel to Houston on Saturday, March 10, 1990 to make the exchange, but did not show up.

Over the next seven days, Wilson and Northcutt had numerous tape-recorded phone conversations which culminated in Wilson's agreement to represent Northcutt in exchange for the cocaine. According to Northcutt, Wilson agreed to represent him in return for the twenty-one kilos of cocaine. Wilson testified that he thought he had agreed to represent Northcutt in return for one kilo of cocaine and $100,000. Wilson had several more telephone conversations with Northcutt attempting to arrange a time and place to transfer the cocaine.

On March 18, Wilson and Northcutt met for about one hour in Wilson's office in Dallas. No tape recording was made of this meeting. Northcutt testified that they discussed the amount of cocaine Wilson's "man" could move a week and the price they expected to obtain for it. According to Northcutt, Wilson told him that ten kilos would pay Wilson for his services in defending Northcutt in the federal charges and the remainder would compensate Wilson for defending the state charges. Northcutt agreed to go to Houston, pick up the cocaine and deliver it to Dallas in a single suitcase as soon as possible. During the days immediately before

3

this meeting, White left several messages with Wilson's message service.

On Tuesday, March 20, 1990, Northcutt returned to Dallas with the cocaine. He went to Wilson's office around 7 p.m. and gave Wilson the key to Room 909 of the Holiday Inn on Central Expressway. In a recorded conversation, Northcutt told Wilson that the cocaine was stored in an expensive Halliburton case that he wanted back. Northcutt also told Wilson that Wilson and "his man" would be impressed with the quality and purity of the drug. Wilson said that he would go right over to complete the pick up. After Northcutt left, Wilson called White and arranged to meet him at the Holiday Inn.

Shortly thereafter, White and Wilson arrived at the Holiday Inn in separate cars. The two spoke briefly and entered the hotel. The DEA, which had already set up a surveillance of Room 909, videotaped the activity in the room. White and Wilson entered the room, turned off the lights and turned up the volume on the television. They explored the room, Wilson peered behind a picture and White covered the smoke detector with a towel. These actions were taken in an obvious attempt to avoid surveillance. They paced the room and then each walked over to the suitcase and lifted it as if to check its weight.

Finally, after about ten minutes, White placed the suitcase on the bed and opened it. He counted the kilos as Wilson observed. White then rearranged the cocaine, closed the suitcase and returned it to the corner of the room. Both men then immediately left the room, placing a do-not-disturb sign on the door. They talked

4

briefly by their vehicles and left the Holiday Inn. At approximately 11 p.m. that night, an unidentified female drove White's car very slowly through the parking lot of the Holiday Inn several times. White was in the car and appeared to be inspecting the lot.

A few hours later, Northcutt called Wilson and reminded Wilson that he wanted to retrieve the bag. Wilson told Northcutt he could retrieve the bag after 10:30 a.m. the next morning. At approximately 10 a.m., Wilson arrived at the Holiday Inn. He proceeded directly to Room 909, entered the room, opened the suitcase and transferred eleven kilograms of cocaine to a green canvas bag he was carrying. Wilson closed the suitcase, containing the remaining ten kilos and returned the suitcase to the corner of the room. Dallas DEA agents arrested Wilson as he left the room.

A few minutes later, White arrived at the Holiday Inn and parked next to Wilson's vehicle. White carried a briefcase containing a canvas bag, similar to Wilson's. As White stepped off the elevator and proceeded towards Room 909, the DEA arrested him. At the time of his arrest White did not have a key to the room.

White and Wilson pled not guilty and were tried together before a jury in January 1991. The court, in its instructions, gave the jury the option of finding the defendants guilty of the lesser included offense of simple possession on Count 1, rather than the charged offense, possession with intent to distribute. But on Count 2, the court did not give the jury the option of finding the defendants guilty on the lesser included offense - conspiracy to possess (rather than the charged offense conspiracy

to possess with intent to distribute.)

During their deliberations, the jury sent out a note to the court which read as follows:

Please clarify if Defendant is found guilty of lesser offense - Count 1 - (possession) is he automatically not guilty on Count 2.

The Court responded:

Members of the jury, in response to your third question, if you have a reasonable doubt about a Defendant's intent to distribute cocaine, you must find the Defendant not guilty of the offense charged in Count 2 of the indictment.

Later that day, the jury sent a message to the court that it had reached a verdict. The verdict form reflected that the jury had found both defendants guilty of the lesser included offense of simple possession on Count 1. The jury made no finding on Count 2. The verdict was read in open court as to both defendants and a poll reflected a unanimous verdict. When questioned about the absence of a verdict on Count 2, the jury foreperson explained that the jury thought that if they could not reach a verdict on Count 1 as charged they could not reach a verdict on Count 2.

The jury was excused for the weekend. Wilson and White argued that the guilty verdict on the lesser included offense on Count 1 precluded a guilty verdict on Count 2 as charged. Alternatively, they argued that if the court intended to require the jury to deliberate further on Count 2, it should authorize the jury to return a verdict on the lesser included offense of conspiracy to possess cocaine (without intent to distribute). The court denied both requests. On Tuesday, the jury was instructed to continue their deliberations on Count 2. After further deliberating, the jury asked whether they could reconsider their verdict on Count 1.

6

Over the defendants' objections the court told them they could. The jury then found the defendants guilty on both counts as charged. White and Wilson appeal. Additional facts necessary to the discussion of particular issues will be presented in the discussion that follows.

## II.

White and Wilson first raise several interrelated issues pertaining to the jury verdict. First they argue that the jury's initial verdict finding them both guilty of simple possession on Count 1 was final at the time announced and could not be reconsidered. They also argue that the verdict on the lesser included offense on Count 1 precluded a guilty verdict on Count 2 -conspiracy to possess with intent to distribute. Finally they argue that in any event, the subsequent verdict on Count 2 was flawed because the district court refused to give a lesser included instruction on that count.

## A.

Federal Rule of Criminal Procedure 31(d) allows further deliberation on an announced verdict if the verdict is not unanimous. Further deliberation is also allowed if the jury expresses uncertainty, contingency or ambiguity in its announced verdict. **United States v. Rastelli**, 870 F.2d 822, 835 (2d Cir. 1989). When the jury initially returned its verdict of guilty to the lesser included offense of conspiracy to possess on Count 1, a poll of the jury revealed that the verdict was unanimous.

We agree with the defendants that the court should not have allowed the jury to reconsider its verdict on Count 1. A verdict

7

is final if (1) the deliberations are over, (2) the result is announced in open court, and (3) the jury is polled and no dissent is registered. **United States v. Taylor**, 507 F.2d 166 (5th Cir. 1975); Fed.R.Crim.P. 31. All of these steps were satisfied in this case when the jury announced its verdict as to Count 1 on Friday, January 18, 1991.

The jury told the court that it had reached a verdict and thought its task was complete. The foreperson stated that they could not agree on a verdict on Count 1 as charged but they had agreed on a guilty verdict on the lesser included offense of possession. The jury was unable to return a verdict on Count 2 because of their inability to agree on whether the defendants intended to distribute the cocaine. The court did not encourage or discourage the jury from returning a partial verdict. It simply accepted the verdict. See **United States v. Di Lapi**, 651 F.2d 140, 146-47 (2d Cir. 1981).

That no verdict was returned on Count 2 does not affect the finality of the partial verdict on Count 1. A trial court may accept a partial verdict on less than all counts of an indictment. **United States v. Ross**, 626 F.2d 77 (9th Cir. 1980). The trial court was free, after accepting the verdict on Count 1, to return the jury for further deliberations on Count 2. **United States v. De Laughter**, 453 F.2d 908, 910 (5th Cir.), cert. denied, 406 U.S. 932, 32 L.Ed.2d 135 (1972); **United States v. Wheeler**, 802 F.2d 778 (5th Cir. 1986).

In sum, the district court erred in allowing the jury to further deliberate on Count 1 after it accepted the jury's verdict

8

on that count.  We therefore vacate the judgment of conviction on Count 1 so the district court, on remand, can reinstate the jury's original verdict on that count and enter judgment on that verdict.

**B.**

Wilson and White argue next that the jury's verdict on Count 2 - guilty of conspiracy to possess with intent to distribute - is inconsistent with the jury's verdict of simple possession on Count 1 and must be set aside.  One problem with the defendants' arguments is that the jury did not find in count 1 that defendants had no intent to distribute the cocaine.  The jury simply could not agree.  In this sense, therefore, the verdicts are not inconsistent.

Even if the verdicts on Counts 1 and 2 were "truly inconsistent," they would still stand.  **United States v. Powell**, 469 U.S. 57, 83 L.Ed.2d 461 (1984).  In **Powell**, the jury found the defendant guilty of using the telephone to facilitate a felony, yet found him innocent of the predicate felony.  The Court stated that "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." **Id.** at 64-65  "It is . . . possible that the jury, convinced of the guilt, properly reached its verdict on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense."  **Id.** at 65.

Thus, even if the verdict on Count 2 is considered inconsistent, it is not subject to attack on that ground.

9

Appellants' contrary argument is without merit.  See also **United States v. Zuniga-Salinas**, 952 F.2d 876 (5th Cir. 1992) (en banc).

**C.**

Appellants argue finally that the district court erred in refusing to give the jury the option of returning a verdict on Count 2 on the lesser included offense - conspiracy to possess cocaine (without intent to distribute it.)  Under Federal Rule of Criminal Procedure 31(c), a defendant is entitled to a jury instruction on a lesser included offense if: (1) the elements of the lesser offense are a subset of the elements of the charged offense; and (2) the evidence at trial permits a jury to rationally find the defendant guilty of the lesser offense, yet acquit him of the greater.  **United States v. Browner**, 889 F.2d 549, 550-51 (5th Cir. 1989) (citing **Schmuck v. United States**, 489 U.S. 705 (1989)).  The parties agree that the elements of the lesser included offense (conspiracy to possess) are a subset of the charged offense (conspiracy to possess with intent to distribute).  Given the quantity of drugs involved in this case, we must decide whether a rational jury could have found that the defendants possessed the drugs but had no intent to distribute them.

White and Wilson argue that Wilson's testimony supports a verdict for simple conspiracy to possess.  Wilson relies first on his testimony that he agreed to accept only one kilogram of cocaine for his personal use plus $100,000 from Northcutt as payment for his legal services.  Wilson testified that when he and White initially went to the hotel room and saw that Northcutt's suitcase contained 21 kilos of cocaine, they left.  He explained that he

10

returned to the hotel and picked up eleven kilos of the cocaine because of his acute need to satisfy his addictive craving. He denied having any intent to distribute any portion of the cocaine. White did not testify and Wilson offered no explanation for the intended disposition of White's share of the cocaine.

Even if we accept Wilson's version of his original agreement with Northcutt to provide a defense in exchange for one kilo plus $100,000, that deal had obviously changed when Wilson picked up eleven kilos of cocaine from the Holiday Inn. The question therefore narrows to whether the district court abused its discretion in declining to instruct on the lesser included verdict in the face of undisputed evidence that these defendants possessed twenty-one kilos of cocaine.

Other circuits have found that lesser quantities of drugs negate the possibility of personal use. For example, in **United States v. Zapata-Tamallo**, 833 F.2d 25 (2d Cir. 1987), the Second Circuit found no error in the trial court's refusal to instruct on the lesser included offense. The defendant's possession of seven and one-half kilograms of cocaine was found to be too great an amount to be possessed solely for personal use. In **United States v. Johnson**, 734 F.2d 503 (10th Cir. 1984), where only 26.33 grams of cocaine were involved, the court found no error in refusing to offer the lesser included offense instruction.

In those and other cases cited by the government, there were additional facts relevant to distribution, i.e., presence of distribution paraphernalia or the use of an exculpatory defense by the defendant which negates simple possession. Facts indicating an

11

ability or intent to distribute are also present in this case. Wilson testified that White was his cocaine supplier. Although the extent of White's distribution network was not presented, the most rational explanation for White's presence in the scheme was that he would sell the cocaine. We conclude that where the defendants are found with twenty-one kilograms of cocaine, no rational jury could find that they did not intend to distribute the cocaine. The sheer quantity of the drugs involved negates an inference of personal use.

The fact that the district court gave the lesser included instruction on Count 1 does not change our opinion. The defendants were not entitled to that instruction. The defendants therefore got a more generous instruction than they were entitled to on the first Count of the indictment. That did not require the trial court to grant them an overly generous instruction on Count 2. Admittedly, the inconsistency in instructing on the lesser included verdict on Count One and declining that instruction on Count 2 created some confusion. But if that confusion had any effect on the verdict it was beneficial to the defendants. We conclude therefore that the trial court committed no reversible error in declining to give a lesser included verdict charge on Count 2.

**III.**

The defendants also argue that the evidence was insufficient to convict them. The standard for reviewing the sufficiency of the evidence on appeal is whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements beyond a reasonable doubt.

12

**United States v. Gallo**, 927 F.2d 815, 820 (5th Cir. 1991); **United States v. Nixon**, 816 F.2d 1022, 1029 (5th Cir. 1987), cert.denied, 484 U.S. 1026 (1988).

Both defendants argue that the evidence was insufficient to establish a conspiracy. They contend that the government introduced no evidence of an agreement between the two defendants. To prove a conspiracy in a drug trafficking case, the government must establish: (1) a common agreement to violate drug trafficking laws, (2) known to the defendants, (3) that the defendants, with knowledge, voluntarily joined. **United States v. Elam**, 678 F.2d 1234, 1245 (5th Cir. 1982). Specifically here, the government was required to prove an agreement to possess cocaine with the intent to distribute it. The government, of course, can prove a conspiracy with circumstantial evidence. **United States v. Bankston**, 603 F.2d 528, 531 (5th Cir. 1979).

The evidence at trial demonstrated that the defendants knew each other well. White was Wilson's cocaine supplier and Wilson had represented White. When Northcutt offered the cocaine to Wilson for his legal services, the jury was entitled to find that Wilson turned to White for assistance in disposing of the cocaine. Wilson and White were in constant contact during the critical stages of the negotiations about the transfer of the cocaine. They arranged to meet and did meet at the Holiday Inn after Northcutt gave Wilson the key to Room 909. They entered the room together and both took precautions to avoid surveillance. White opened the suitcase containing the cocaine and together with Wilson counted it and returned it to its original position. They left the

13

room together and conversed in the parking lot before separating for the remainder of the evening. The next morning, they arrived at the motel within minutes of each other -- each carrying a canvas bag capable of holding half of the twenty-one kilos of cocaine. Also, as discussed previously, the sheer volume of the cocaine involved is clearly sufficient to support the inference that the defendants intended to distribute the drugs. **United States v. Dreyfus-de Campos**, 698 F.2d 227, 230 (5th Cir.), cert. denied, 461 U.S. 947, 103 S.Ct. 2128 (1983). This evidence is sufficient to support the jury's verdict finding that White and Wilson conspired to possess cocaine with intent to distribute it.

White alone challenges the sufficiency of the evidence to convict him on Count 1 - possession with intent to distribute. The bulk of his argument goes to the absence of evidence to support an inference that he intended to distribute the cocaine. We need not consider this argument. Our conclusion that the jury's initial verdict on the lesser included charge of simple possession must be reinstated makes the distribution element of the offense irrelevant.

**IV.**

Next, Wilson argues that the court's jury instruction regarding intent to distribute was incorrect because it created a presumption that impermissibly shifted the burden of proof on this issue to the defendants. The court instructed the jury:

> You may infer that an individual possessed a controlled substance with the intent to distribute it if it is inconceivable that the amount possessed was intended for personal consumption.

Because Wilson did not object to the instruction at trial, we

14

"will uphold even an inaccurate jury instruction provided no `plain error' has resulted from the inaccuracy." **United States v. Birdsell**, 775 F.2d 645, 654 (5th Cir. 1985), cert. denied, 476 U.S. 1119 (1986), quoting **United States v. Reeves**, 752 F.2d 995, 1000 (5th Cir. 1985). "Plain error is error which, when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity or public reputation of judicial proceedings." **United States v. Vonsteen**, 950 F.2d 1086, 1092 (5th Cir. 1991)(en banc). (internal quotations and citations omitted)

Wilson relies on a number of cases that criticize instructions directing the jury to presume the existence of an element of the crime, if it believes certain evidence. See **Francis v. Franklin**, 471 U.S. 307, 317 (1985); **Carella v. California**, 491 U.S. 263, 109 S.Ct. 2419, 2420 (1989); **Sandstrom v. Montana**, 442 U.S. 510 (1979). The challenged jury instruction in this case simply does not fall in the category of instruction prohibited by the above cases. The district court told the jury "you may infer" intent to distribute based on the quantity of drugs. It did not require the jury to presume defendant's intent to distribute based on the quantity of drugs involved. Thus, if the challenged instruction was erroneous at all, which is doubtful, it certainly did not rise to the level of plain error.

**V.**

The defendants next contest two of the district court's evidentiary rulings. First, they contend that the district court should not have admitted testimony concerning two extrinsic

15

offenses -- money laundering and possession of steroids -- allegedly committed by Wilson.[2]  Second, they argue that the district court should have permitted Northcutt's previous attorney to testify regarding Northcutt's expressed intent to fabricate evidence in another case to gain favorable consideration from the government.  We review the district court's evidentiary rulings for abuse of discretion.  **United States v. Rocha**, 916 F.2d 219, 241 (5th Cir. 1990).

## A.

John Hoffman, one of Wilson's former clients, testified for the government.  After Hoffman had been charged with importing anabolic steroids, he consulted Wilson, who agreed to represent him.  During the pendency of these charges, Hoffman asked Wilson to help protect proceeds of his sales from government seizure.  Wilson set up a trust account in Wilson's name and Hoffman directed his debtors to send the money to that account.  The funds were used to pay attorneys fees due Wilson as well as for Hoffman's living expenses.  Hoffman testified that some of the money in the account was from the sale of illegal steroids and some from the sale of

---

[2]      This argument is raised by both defendants even though the testimony regarding extrinsic offenses related only to defendant Wilson. The government argues that this point of error does not apply to White because the court admonished the jury several times that the Rule 404(b) evidence introduced against Wilson should not be considered against White.  However, the court recognized in discussions outside the presence of the jury that White's culpability was "largely vicarious; that is, either as an aider and abettor of the Defendant Wilson on Count 1 which is alleged in Count 1, or as a conspirator in Count 2."  The jury instructions contained those theories on which White could have been convicted.  Given our disposition of this issue, we need not decide whether White could use this alleged error to challenge his own conviction.

16

legal vitamins.  In addition, Wilson allowed Hoffman to store some steroids at Wilson's house after Hoffman's arrest.  Hoffman stated that it takes about four weeks to withdraw gradually from steroids and he didn't want to keep the drugs in his home.  About twice a week, Hoffman would go to Wilson's home and take an injection of steroids from the cache.

The government introduced Hoffman's testimony at trial under Rule 404(b)[3], as probative of Wilson's intent in this case.  Interpreting this rule, this circuit holds that such evidence is admissible if (1) it is relevant to an issue other than the defendant's character, and (2) the probative value of the evidence substantially outweighs the undue prejudice.  **United States v. Beechum**, 582 F.2d 898, 911 (5th Cir. 1978)(en banc).  To meet the first prong of the **Beechum** test, the jury must have been able to reasonably find that the extrinsic offense was committed by the defendant.  **Id.** at 913.  In addition, "[w]here the issue addressed is the defendant's intent, extrinsic offenses that are similar in nature are admissible because `the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses.  The reasoning is that because the defendant had unlawful

---

[3]     Rule 404(b) states:

**(b) Other crime, wrongs, or acts.**  Evidence of other crimes, wrongs, or acts is not admissible to prove the a character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

17

intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense.'" **United States v. Osum**, 943 F.2d 1394, 1404 (5th Cir. 1991). citing **Beechum** at 911.

Wilson challenges the admission of the evidence first by arguing that the government did not prove that Wilson's conduct constituted illegal money laundering. Money laundering requires proof of knowledge that the funds were derived from an illegal source. 18 U.S.C. §§ 1956 and 1957. The testimony of Hoffman was a sufficient basis from which the jury could find that Wilson knew that at least some of the funds came from Hoffman's sale of illegal steroids. **United States v. Johnson**, 872 F.2d 612, 624 (5th Cir. 1989)(Testimony of single witness sufficient to establish extrinsic offense.) In addition, Wilson's precautions against government seizure of the proceeds of Hoffman's sales tend to support the government's position that Wilson knew the funds were not from a legitimate business.

Wilson also argues that the extrinsic acts are not similar to the charged offenses in this case and are therefore not relevant to any issue other than his character. We disagree. Wilson argued entrapment and diminished capacity to negate an inference that he intended to distribute the cocaine. These defenses place Wilson's intent and predisposition to commit a crime directly in issue. **United States v. Kirk**, 528 F.2d 1057 (5th Cir. 1976) (defense of intoxication places intent in issue); **United States v. Parrish**, 736 F.2d 152 (5th Cir. 1984) (defense of entrapment places predisposition in issue).

Wilson testified at length about the six day sleepless cocaine

18

binge he was on which ended at the time he was arrested when picking up the eleven kilos of cocaine. He argued that in this state of mine he lacked the capacity to form the criminal intent necessary to be convicted and that Northcutt and the DEA had entrapped him. Both extrinsic offenses testified to by Hoffman, while not identical to the offenses charged in this case, were committed at times when Wilson was using cocaine but was not on a "binge". They are relevant to establish that Wilson could form the intent to engage in illegal activity -- storing illicit drugs and protecting the proceeds of the sale of these drugs -- to assist his clients and secure his fee. Both occurred when he was not under the influence of a prolonged cocaine binge. The evidence also shows Wilson's predisposition to violate drug trafficking and money laundering laws and tends to negate Wilson's defense of entrapment.

Wilson argues finally that any probative value of the extrinsic offense evidence is outweighed by its prejudicial impact on the jury. The jury was carefully instructed about the limited purpose of this evidence both at the time of the testimony and before deliberations. We have held that danger of prejudice to the defendant is minimal so long as it is clear to the jury that the extrinsic evidence is being introduced for the sole purpose of showing intent. **United States v. Williams**, 900 F.2d 823, 827 (5th Cir. 1990). Given the probative value of the evidence and the district court's limiting instruction, the court did not abuse its discretion by permitting the government to introduce this evidence.

**B.**

White and Wilson sought to invoke Rule 404(b), along with

19

Rules 405(b) and 406, to introduce evidence of extrinsic offenses committed by Northcutt, the government's star witness. They proffered testimony by Northcutt's prior attorney that Northcutt had previously offered to fabricate testimony against an individual in exchange for government leniency in charges pending against him.

The defendants argue that Northcutt's testimony was admissible under Rule 404(b) to show Northcutt's intent to fabricate evidence in order to gain favorable consideration from the government in his own case. The district court, relying on Rule 608(b)[4] ruled that the defendants could elicit the evidence of Northcutt's credibility only on cross-examination of Northcutt, not through an extrinsic source. We agree.

First, except for his credibility, Northcutt's intent was not an issue in the case. **Reeves**, 892 F.2d at 1225. Also, unlike the defendant's evidence in **United States v. McClure**, the proffered evidence in this case was not probative of Wilson's intent to commit the charged offense. 546 F.2d 670 (5th Cir. 1977). This evidence could have served only one function: to demonstrate that Northcutt had a proclivity to lie and therefore was probably lying

---

[4] Federal Rules of Evidence 608(b) provides:

**(b) Specific instances of conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. . . .

in this case.  Rule 404(b) prohibits the use of extrinsic act evidence for this purpose.  The use of evidence to attack a witness's credibility is subject to the limitations of Rule 608. Under that rule, specific instances of misconduct of a witness for that purpose  can not be proved by extrinsic evidence.  The trial court did not abuse its discretion by excluding the proffered testimony.

## VI.

Wilson argues finally that the district court improperly adjusted his sentence by increasing his offense level two points for abuse of a position of trust or use of a special skill. U.S.S.G. § 3B1.3.  We will "uphold the district court's sentence so long as it results from a correct application of the guidelines to factual findings which are not clearly erroneous."  **Foster** (cited below) citing 18 U.S.C. § 3742(d); **United States v. Mejia-Orosco**, 867 F.2d 216, 221 (5th Cir. 1989); and **United States v. Sarasti**, 869 F.2d 805, 806 (5th Cir. 1989).

Section 3B1.3 of the Sentencing Guidelines reads:

If the defendant . . . used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.  . . .

Application Note 2 to this section states:

"Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.

The "Background" information indicates that:

This adjustment applies to persons who abuse their . . . special skills to facilitate significantly the commission or concealment of a crime.  Such persons generally are viewed as more culpable.

21

The presentence report recommended the increase because Wilson was a well-respected lawyer who was able to use his reputation to conceal his drug-related activity. The district court stated the following reasons for the increase:

> [I]f Mr. Wilson were not a professional person who was in a position to charge substantial amounts of money for personal services, then I can't imagine that sort of trade ever being feasible. Moreover, I think it was facilitated because of his knowledge as an attorney, because of his knowledge of laws in those areas and how to avoid detection and of course communications between clients or would-be clients and attorneys are not as easily detected or apprehended as perhaps would be other communications.

To apply § 3B1.3 to any factual scenario, two factors must be evaluated. First, whether a position of trust or special skill existed, and second, whether the defendant used the position or skill "in a manner that significantly facilitated the commission or concealment of the offense." **United States v. Brown**, 941 F.2d 1300, 1304 (5th Cir. 1991). Clearly the skills possessed by lawyers are "special skills" which the guideline recognizes could be used to facilitate or conceal a crime. See Application Note 2. The question for decision therefore narrows to whether the district court's finding that Wilson used his skills as a lawyer to "significantly facilitate the commission or concealment" of his offense is clearly erroneous.

First, Wilson's skills as a defense lawyer specializing in the defense of drug cases placed him in a unique position to trade services for drugs. Such services are so valuable to an indicted drug trafficker that it is easy to understand why he would give up a fortune in drugs to obtain them. Also, Wilson relied on his attorney/client relationship to talk confidentially with Northcutt

22

and arrange the drug transfer.  In addition, Wilson used knowledge he had acquired as a prosecutor and defense lawyer to avoid surveillance in their first visit to Room 909 of the Holiday Inn and otherwise to avoid detection and apprehension.

These charges followed a sting operation.  Thus, the success of the criminal enterprise was doomed from the outset.  But we are unwilling to say that failure of the objective of the conspiracy means the defendant's special skills did not "significantly facilitate" the criminal activity.  We look at the use of those skills through Wilson's eyes.  He used those skills to generate the drugs to be distributed.  He later used those skills to facilitate transfer of the drugs without being caught.  The district court's findings on this issue are not clearly erroneous.

For the foregoing reasons the convictions of defendants White and Wilson on Count 1 are vacated.  Their convictions on Count 2 are affirmed.  This case is remanded for entry of a judgment of conviction on the original verdict in Count 1 and for resentencing.

VACATED in part, AFFIRMED in part and REMANDED.


KING, Circuit Judge, concurring in part and dissenting in part.


Although I concur in the majority's affirmance of Appellant White's conviction, I find merit in Appellant Wilson's claim that he was entitled to a jury instruction on the lesser-included offense of conspiracy to possess cocaine.  Accordingly, I respectfully dissent from the decision to affirm his conviction.

23

## I. The Evidence Supporting Wilson's Theory of the Case

As an initial matter, I believe it is necessary to set out in some detail the extensive trial testimony offered by the defense that supports Wilson's claim that he conspired only to possess, and never harbored any intent to distribute, the cocaine. Waiving his Fifth Amendment right, Wilson took the witness stand and testified at great length about a number of matters that are directly relevant to his claim of entitlement to a lesser-included offense instruction. First, he told of his extensive history of substance abuse which he inherited from his father's side of the family. He testified about his bouts with alcoholism as early as his high school years, his addiction to various prescription medications, and finally his severe cocaine abuse that led to the conviction which is the subject of this appeal.

Specifically, with respect to his cocaine addition, Wilson stated that within a short time after his first exposure to the drug he was intensely addicted. He testified that had snorted so much cocaine within the first eight months of use that the drug had eaten away most of the septum inside his nose. Wilson's preferred method was to drink cocaine powder stirred into ice water. He claimed that he ingested massive doses of the drug in this manner. He recounted periods in which he was so affected by the drug that he could not eat or sleep for over a week. During these periods Wilson described his mind as "ra[c]ing literally a hundred and fifty miles an hour." He further discussed how his tolerance to cocaine dramatically increased over time, requiring increasing doses to acquire the same physical effect. Wilson explained to the

24

jury how excruciating his withdrawals were -- "the most unimaginable torture" -- and that his chief concern at any given moment was to possess an adequate stash of cocaine. "I had a horror of running out of it. I didn't want that to ever, ever happen. I wanted to get enough so I didn't run out," he told jurors.

Wilson also discussed his relationship with White and Northcutt. Wilson denied having bargained for twenty-one kilograms of cocaine; he testified that he had agreed with Northcutt to exchange legal services for $100,000 and one kilogram of cocaine. Wilson claimed that Northcutt had never stated that he was going to leave twenty-one kilograms in the hotel room where Wilson agreed to pick up what he expected would be $100,000 and one kilogram of cocaine.[5]

Wilson testified that his friend White's role in the transaction was limited to serving as a bodyguard on the night of November 20, 1990, when the two men went to the Holiday Inn to pick up what Wilson believed would be cash and a single kilogram of cocaine. Wilson claimed that he told White that Wilson was going to pick up a large amount of cash and that White had no knowledge of any cocaine being exchanged until the two men opened up the suitcase and discovered twenty-one kilograms.[6]

---

[5] The only evidence that the Government offered regarding the alleged agreement to exchange twenty-one kilograms was Northcutt's uncorroborated testimony. Unlike numerous other conversations between Northcutt and Wilson, that alleged conversation was not taped-recorded.

[6] The recording of the events in the hotel room was only on videotape. The Government did not offer any audiotape into evidence, so there is no way to determine what the two men said

25

Wilson testified that after the two men left the hotel room without taking any of the cocaine, Wilson stayed up that entire night exhausting his own supply of cocaine. Wilson claimed that at this point he was on a severe cocaine binge, which had been exacerbated by the prospect of possessing the tremendous amount of cocaine that he had seen at the hotel. He stated that the next morning he drove to White's house, hoping White would offer him cocaine, which White did not. Wilson denied that the two made any arrangements about Northcutt's cocaine. Wilson, who claimed he had that morning degenerated into a state of diminished capacity, testified that he was so addicted to the drug that he was unable to resist the siren song of the abundance of cocaine in the hotel room. Wilson then testified about going to the hotel for the second time:

> I can't really explain what my intent was at that time. I don't know if I had any intent. I was being pulled toward the cocaine . . . . When I got to the hotel I went back upstairs. I went up to the 9th floor. . . . I walked in. I put whatever I put in the green bag. I didn't even count them. There was no need for me to count them. It was a lot of cocaine. I put it in the bag, and I bolted out the door. . . . I was going to go take the cocaine that I had, I was going to go . . . somewhere and do that stuff until I ran out of it again which would have been several years admittedly, but I wouldn't have lived that long. I was going to do it and do it, and I was going to see this thing through to the end of me. . . . I was going to do cocaine until I couldn't do anything else.

When police arrested Wilson as he exited from the hotel, they found on his person a small amount of cocaine and a straw -- a snorting device -- containing a residue of cocaine.

A second defense witness, psychiatrist James Grigson,

---

to each other.

testified that he had known Wilson for some time, in both a professional and personal capacity. Grigson corroborated Wilson's testimony about his long history of severe substance abuse. Grigson opined that in Wilson's case his "propensity" was congenital. Grigson was specifically questioned in the hypothetical about whether someone in Wilson's state of severe addiction might have been able to form an intent only to possess an inordinately large quantity of cocaine, such as that involved in the instant case, rather that to possess with the intent to distribute. The following colloquy with defense counsel merits full quotation:

> Q.   As I described specific intent -- that is intent to distribute as opposed to general intent that is an intent to possess for one's self -- what happens to [a seriously addicted] individual's capacity to form specific intent as opposed to general intent?
>
> A.   It would become less and less because they would not see beyond simply obtaining, getting.  So they will not be thinking in terms of goal-oriented achievement, future acts.  It would be here and now.
>
> Q.    . . . [I]f such an individual were given an opportunity to obtain more cocaine, even at great potential personal risk or cost, absent some intervening circumstances beyond an individual's control, could this person's behavior be predicted?
>
> A.   Yes, sir, it could be.
>
> Q.   What would it be?
>
> A.   They would try to obtain at any expense. . . .

## II. Wilson's Entitlement to a Lesser-Included Offense Instruction

Turning to the legal significance of this testimony, I believe that under the established standards regarding the propriety of lesser-included offense instructions, Wilson was entitled to an

27

instruction on conspiracy to possess. I agree that in reviewing a district court's refusal to submit a lesser-included offense instruction, we must apply the two-pronged standard which the majority applies. See Schmuck v. United States, 489 U.S. 705 (1989). With deference, I disagree with the majority's application of the second prong -- whether "a jury could rationally find the defendant guilty on the lesser offense, yet acquit him of the greater." Id. at 716 n.8.

The majority errs by accepting the Government's argument that Wilson cannot possibly satisfy the second prong in view of the large amount of cocaine involved in this case. The Government argues that the extensive quantity precludes a jury from rationally finding that Wilson did not conspire to possess with the intent to distribute, as opposed to conspiring with the intent only to possess. The Government and the majority cite cases from other circuits in which courts have rejected a defendant's claim of entitlement to a lesser-included offense charge when a defendant possessed an amount of cocaine so large that it belied any suggestion of personal use. See, e.g., United States v. Zapata-Tamallo, 833 F.2d 25 (2d Cir. 1987) (jury could not rationally find that defendant possessed seven-and-a-half kilos of cocaine for personal use).

Such cases are not precisely on point in the present case. To my knowledge, in no case in which a court has denied a defendant a lesser-included offense instruction on simple possession because he possessed a large amount of narcotics, see generally, David E. Rigney, Annotation, Propriety of Lesser-Included-Offense Charge in

28

Federal Prosecution of Narcotics Defendant, 106 A.L.R. Fed. 236 (1992) (collecting cases), did the defendant take the stand and offer the same type of defense as Wilson.  Wilson claimed that he was so addicted that his only intent was to possess enough cocaine to enable him to ingest the drug for the remainder of his life, even if he died in the process of attempting to consume it all.  He testified that he was so mentally and physically affected by his addiction that his <u>exclusive</u> desire was to ingest the drug.  Dr. Grigson's testimony supported this claim.  Moreover, as the majority notes, in cases like <u>Zapata-Tamallo</u>, the Government offered other evidence that indicated that a defendant who possessed a substantial amount of a controlled substance also intended to distribute it.  In the instant case, the Government was unable to offer against Wilson the usual evidence of an intent to distribute, such as paraphernalia commonly associated with distribution or a prior criminal record of distribution.  Indeed, as the majority points out, the Government's only evidence of <u>Wilson's</u> intent to distribute, other than the sheer quantity of cocaine involved, was evidence that <u>White</u> had in the past distributed cocaine to Wilson.

A well-established line of authority holds that a lesser-included offense instruction is required if <u>any</u> evidence is offered that permits jurors rationally to acquit of the greater offense and convict of the lesser -- irrespective of how tenuous or unbelievable a judge may consider the testimony or evidence to be. <u>See</u>, <u>e.g.</u>, <u>United States v. LaMorte</u>, 950 F.2d 80, 84 (2d Cir. 1991) ("It is well settled that 'a criminal defendant is entitled to have

29

instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be'" (citation omitted).); United States v. Soleto-Murillo, 887 F.2d 176, 178 (9th Cir. 1989) ("[The] evidence may be weak, insufficient, inconsistent, or of doubtful credibility" (citation omitted).); United States v. Thorton, 746 F.2d 39, 47 (D.C. Cir. 1984) ("Under settled principles, . . . a defendant is entitled to an instruction on a lesser included offense if there is any evidence fairly tending to bear upon the lesser included offense, `however weak' that evidence may be."); United States v. Chapman, 615 F.2d 1294, 1301 (10th Cir. 1980), cert. denied, 446 U.S. 467 (1980).[7]    The Supreme Court has long espoused similar views, at least in the context of murder trials. See, e.g., Beck v. Alabama, 447 U.S. 625, 635 & n.11 (1980); Stevenson v. United States, 162 U.S. 313, 314-15, 323 (1896).  In Stevenson, the trial judge denied the capital defendant's request for a lesser-included offense instruction on manslaughter.  The Court reversed the conviction.  The Court held that a judge's opinion that the evidence against a defendant was not credible or otherwise had no probative value was irrelevant to determining whether a defendant was entitled to a lesser-included offense instruction on manslaughter.  As the Court stated, weighing evidence is the exclusive province of the

jury:

---

[7]  The majority of state courts likewise adhere to this extremely permissive standard.  See, e.g., State v. Belle, 576 A.2d 139, 148 (Conn. 1990); Williams v. State, 665 P.2d 260, 261 (Nev. 1983) People v. Farmer, 365 N.E.2d 177, 180 (Ill. App. 1977).

30

> [A]s long a there is some evidence upon the subject [of manslaughter] the proper weight to be given it is for the jury to determine. . . . <u>The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self-defense, and yet, so long as there was some evidence relevant to the act of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be [a] matter of law for the decision of the court.</u>

<u>Id.</u> at 314 (emphasis added); <u>see</u> <u>also</u> <u>Sparf & Hansen v. United States</u>, 156 U.S. 51 (1895).

Therefore, when a defendant seeks a lesser-included offense instruction, a judge must look at the evidence supporting the defendant's theory of the case, in the light most favorable to the defendant, and ask only whether the evidence proffered is minimally sufficient to support an acquittal on the greater offense and a conviction on the lesser-included offense. <u>Cf.</u> <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979) (discussing similar approach in context of appellate review of constitutional sufficiency of the evidence to support a conviction).[8] Because Wilson undoubtedly presented <u>some</u> evidence upon which a jury could rationally acquit of conspiracy to possess with the intent to distribute and instead convict of conspiracy to possess, a lesser-included offense

---

[8] <u>Jackson</u> concerns appellate review of the sufficiency of evidence <u>to convict</u>, while the instant case involves appellate review of the sufficiency of evidence <u>to acquit</u>. While <u>Jackson's</u> "deferential standard of review," <u>United States v. Nusraty</u>, 867 F.2d 759, 765 (2d Cir. 1989), is analogous, it is not exactly the converse of the review in this type of case. Although appellate courts assess the sufficiency to convict by considering the evidence in a light most favorable to the prosecution, <u>Jackson</u> still establishes a rather high evidentiary floor: a rational jury must find beyond a reasonable doubt. The standard for a rational acquittal is much more permissive. A rational jury obviously need not find a fact beyond a reasonable doubt to rationally acquit. There must only be <u>some</u> evidence, however slight, to acquit.

instruction should have been granted.

There is one exception to the rule that once the defense offers _any_ evidence supporting its theory it is entitled to a lesser-included offense instruction. That exception, allowing a judge as a matter of law to foreclose a jury's consideration of such evidence for purposes of convicting of a lesser-included offense, is when the defense's testimony or other evidence is "incredible or otherwise insubstantial on its face" -- such as if the defendant's claim "could not have occurred under the laws of nature." United States v. Osum, 943 F.2d 1394, 1405 (5th Cir. 1991).

While it may raise eyebrows, Wilson's theory of personal use is not facially incredible or insubstantial. Wilson's most compelling testimony, which was supported by Dr. Grigson's expert opinion, was that Wilson entered into the conspiracy because he saw it as an opportunity to possess all the cocaine that he could possibly ever consume, even if it killed him in the process. Wilson portrayed himself as a proverbial Midas with respect to cocaine. The substantial amount of cocaine involved is, thus, consistent with Wilson's theory of defense. Jurors would not have been irrational in crediting the defense's claim, supported by voluminous testimony from Wilson and Grigson, that Wilson never intended to distribute and conspired only to possess the cocaine for personal use.

Accordingly, I believe that Wilson should be granted a new trial. I respectfully dissent from the decision to affirm his conviction.

32