[Cite as *State v. Hunter*, 2016-Ohio-123.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-140684 |
| | | C-140704 |
| Plaintiff-Appellee, | : | C-140717 |
| | | TRIAL NOS. B-1400110 |
| vs. | : | B-1400199 |
| | | |
| TRACIE M. HUNTER, | : | *O P I N I O N.* |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  January 15, 2016

*Mark R. Meterko*, *Karl H. Schneider*, *R. Scott Croswell, III*, and *Merlyn D. Shiverdecker*, Special Prosecuting Attorneys, for Plaintiff-Appellee,

*Ohio Justice & Policy Center* and *David A. Singleton,* for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**MOCK, Judge.**

{¶1}     In three assignments of error, defendant-appellant Tracie M. Hunter appeals the decision of the trial court convicting her of one count of having an unlawful interest in a public contract.  We affirm.

### Factual Background

{¶2}     In 2010, Hunter ran for a judgeship in the Hamilton County Juvenile Court.  Following litigation over the counting of provisional ballots, she was determined to have won the election and was sworn in on May 25, 2012.

{¶3}     Over time, employees in the prosecutor's office noticed what they believed to be a pattern of Hunter backdating certain entries.  These employees suspected that Hunter was backdating the documents with the specific intention of depriving their office of the ability to timely appeal the decisions.  After an internal investigation concluded, the Hamilton County prosecuting attorney asked the common pleas court to appoint special prosecutors to investigate the activity.  The common pleas court appointed two special prosecutors, who conducted their own investigation and eventually convened a special grand jury to assist them.  At the conclusion of its investigation, the grand jury indicted Hunter on nine counts involving several alleged instances of illegal conduct while in office.

### The Termination Proceedings against Steven Hunter

{¶4}     The sixth count of the indictment alleged that Hunter had an unlawful interest in a public contract, in violation of R.C. 2921.42(A)(1).  According to the testimony presented during trial, the charge stemmed from the termination proceedings against Steven Hunter, an employee of the Hamilton County Juvenile Court's Youth Center ("Youth Center") and Hunter's brother.

2

{¶5}     Steven Hunter was employed as a juvenile corrections officer.  On July 7, 2013, Steven Hunter was involved in an incident in which he was alleged to have hit a youth in the intake department of the detention center.  As a result of that incident, Dwayne Bowman, the superintendent of the Youth Center, recommended that the court terminate Steven Hunter and that a hearing be scheduled for that purpose.

{¶6}     Steven Hunter was informed of the decision on July 25, 2013.  Shortly after 10:30 that evening, Hunter sent an email to all employees of the Youth Center in which she identified a number of safety concerns, which she said had been brought to her attention as a result of an email she had sent out previously.  She said that she would schedule a closed meeting to discuss the issues with the corrections officers.

{¶7}     Bowman testified that the email was troubling.  He said that he was concerned that the email "would cause confusion with the staff at the youth center.  Mr. Hunter's termination process was still occurring and I believe that it could jeopardize that process."  Bowman noted that many of the items on Hunter's list echoed the main explanations that Steven Hunter had given for his actions during the July 7 incident, suggesting that the email was Hunter's way of inserting herself into the proceedings.  Brian Bell, assistant superintendent of the Youth Center, had similar concerns, testifying that he felt that "she was going to speak to the residents about it to conduct basically her own investigation."

{¶8}     On July 29, 2013, Hunter sent an email to Bowman in which she requested that he send her a number of documents.  The email demanded

> copies of all incident reports related to [the youth] and any and all JCOs
> involving [the youth] and other staff, prior or subsequent to alleged
> incident with JCO Hunter.  All incidents reported during any time frame
> that [the youth] was detained at the Youth Center, shall be included.

Please provide copies of all drug tests performed of [the youth] during all times at Youth Center. Medical reports of any positive drug tests shall also be included, including the substances detected.

Please forward all copies of all incidents reported involving [the youth] with police.

{¶9} Bowman replied by asking Hunter if she wanted only the incident reports, or if she also wanted "other documents related to our investigation." Bowman testified that he had asked that clarifying question because Hunter was requesting documentation that was "above and beyond the information that we would normally provide to someone not directly involved in the investigation or someone from the investigative team." He was concerned at that point and was "trying to protect the integrity of the disciplinary process, of the investigation, * * * and also to give the judge the opportunity to clarify that she was not asking for that kind of information, but just the information of the incident." Rather than restraining her query, Hunter replied that she wanted "all documentation of every incident and every employee pertaining to [the youth] during his stay at the Youth Center * * *."

{¶10} Bowman testified that this exchange was very stressful for him. He said that he was greatly concerned because "[i]t was something that I had not experienced before for a judge to be directly involved in an incident there at the Youth Center. Certainly the fact that this was the brother of the judge." Likewise, Bell testified that he had never seen a judge directly involved in the disciplinary process of a Youth Center employee. According to Bell, the types of documents provided to Hunter would not have been provided to an employee under any circumstances.

{¶11} Bowman provided the documents to Hunter that day. Steven Hunter testified that Hunter then provided the documents to him, which he in turn brought to

his attorney that evening. His attorney testified that she only accepted some of the documents. His attorney testified that she refused to accept some of the documents because it would have been "unethical" for her to take them and that she was "concerned that [she] might have to make an ethical report to the Supreme Court about the person that gave him" the documents.

{¶12} The next morning, Steven Hunter appeared with his attorney for the hearing. Bell testified that, under normal circumstances, the first hearing is continued because the employee receives his discovery packet at the first hearing and usually requires time to review the documents. Steven Hunter's counsel was able to proceed with the hearing that day, which concluded after several hours. Steven Hunter was eventually terminated.

### The Trial and Verdict Return

{¶13} After Hunter's indictment, the case proceeded to a lengthy jury trial. After five weeks of testimony, the jury received the case. Jury deliberations began the afternoon of Wednesday, October 8, 2014. On Friday at 4 p.m., the jurors said that they had reached a verdict on Count 6, but were unable to reach a verdict on the other counts. The foreperson gave the completed verdict form to the trial court. In open court, the trial court reviewed the document and ordered the jury to be polled as to whether the verdict was theirs. Each member of the jury answered affirmatively without equivocation. The trial court then said:

> I'm going to - - I have indicated that this verdict will be in. We are not indicating what the verdict is, but this verdict will be entered. And I'm going to hand this verdict to the court reporter, Mr. Blum, and I'm going to ask him if he would seal this verdict.

5

Defense counsel entered no objection to the procedure employed by the trial court. The jury then received the *Howard* charge—a supplemental instruction for the court to give a deadlocked jury designed to encourage the jurors to reach a verdict. *See State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989). The trial court dismissed the jury for the holiday weekend.

{¶14}    The jury returned Tuesday morning and resumed deliberations. Shortly after noon, the jury returned to the courtroom and the foreperson informed the trial court that the jurors could not reach a verdict on the remaining counts. Once the trial court was satisfied that further deliberation would be fruitless, the clerk read the verdict for Count 6 in open court. After the trial court thanked the jury for its service, but before the jurors were excused, counsel for Hunter asked that the jury be polled as to Count 6.

THE COURT: The jury has already been polled. They were previously polled and that's it. They were polled. They were polled.

MR. BENNETT: I thought until the verdict was published.

THE COURT: They were polled and they were asked whether Count 6 was their true verdict and they indicated yes and so it's over. I indicated that.

{¶15}    The matter was continued to allow for a presentence investigation, after which Hunter was placed on community control for one year, and was ordered to serve 180 days in the Hamilton County Justice Center. Hunter's sentence has been stayed pending this appeal.

### The Acquittal Motion was Properly Denied

{¶16}    In her first assignment of error, Hunter claims that the trial court erred when it denied her motion for an acquittal. The standard of review for the denial of a Crim.R. 29 motion for an acquittal is identical to the standard of review

for a sufficiency-of-the-evidence claim. We examine the evidence admitted at trial in the light most favorable to the state. We then determine whether that evidence could have convinced a rational trier of fact that the essential elements of the crime had been proved beyond a reasonable doubt. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. It is a test of adequacy, and whether the evidence is sufficient to sustain the judgment is a question of law. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 11.

{¶17} R.C. 2921.42(A)(1) states that "[n]o public official shall knowingly * * * employ the authority or influence of the public official's office to secure authorization of any public contract in which * * * a member of the public official's family * * * has an interest." A "public contract" is defined to include "the purchase or acquisition, or a contract for the purchase or acquisition, of property or services * * * including the employment of an individual by the state, any of its political subdivisions, or any agency or instrumentality of either." R.C. 2921.42(I)(1).

{¶18} Hunter first argues that since the statute speaks of securing authorization, it would only criminalize interference in the initial hiring of a family member—interference in a termination proceeding would not be covered. But "securing" has meanings in addition to those relating to an initial acquisition. According to *Black's Law Dictionary*, the word "secure" can also relate to preventing exposure to danger, to make safe, or to make "so strong, stable, or firm as to insure safety and financial security." *Black's Law Dictionary* 942 (Abridged 6th Ed.1991). Thus, the statute encompasses not just the initial acquisition of employment, but also any subsequent conduct designed to protect the employee's position.

{¶19} Our reading of the statute comports with the position of the Ohio Ethics Commission on the matter. *See State v. Urbin*, 100 Ohio St.3d 1207, 2003-

7

Ohio-5549, 797 N.E.2d 985, ¶ 4 (Moyer, C.J., concurring) (it is appropriate to consider opinions from the Ohio Ethics Commission when interpreting the scope of R.C. 2921.42). In 1992, that body concluded that the statute "extends beyond the initial hiring of the family member and prohibits a public official from participating in any matter or decision which would affect the continuation, implementation, or terms and conditions of an individual contract of employment for a member of his family." *See* 1992 Ohio Ethics Commission Op. No. 92-012.

{¶20} Limiting the applicability of R.C. 2921.42(A)(1) would inappropriately and drastically constrain the statute's scope and would fail to curtail a majority of the abuse the General Assembly intended to prevent. As the Ohio Ethics Commission noted,

> [i]f it were held that the prohibitions imposed by R.C. 2921.42(A)(1) applied only to authorizing or securing a family member's initial employment, then the prohibitions could be effectively circumvented where a public official did not participate in the initial hiring decision, but subsequent to the initial employment he authorized or approved payments to a family member for services rendered, or advocated, recommended, voted upon, or participated in discussions or decision-making regarding such matters as pay raises, additional benefits, or other modifications of the public employment.

1992 Ohio Ethics Commission Op. No. 92-012.

{¶21} Therefore, we hold that a violation of R.C. 2921.42(A)(1) includes not only interference with the initial decision to employ a family member, but also extends to other areas of employment, including termination proceedings.

8

{¶22} Hunter next argues that the record does not support her conviction. We disagree. Both Bowman and Bell testified that they perceived Hunter's conduct as her attempting to interfere with the disciplinary process and her brother's termination. Bowman provided the documents to Hunter, and her delivery of the documents to her brother concluded the matter. While Hunter argues that the state failed to meet its burden of proof because it did not demonstrate which documents were actually provided, we find that a jury could reasonably infer that the documents were ones to which Steven Hunter was not entitled based on the testimony of Bowman and Bell and how Steven Hunter's attorney treated them.

{¶23} Hunter further argues that she could not be convicted because her brother was actually fired. Thus, her intercession was without fruit and no interference occurred. But, on this record, we conclude that the crime was complete, at the latest, when she delivered the documents to her brother. At that moment, she had used her authority or the influence of her office to secure her brother's continued employment. For our purposes, the outcome of the proceeding was immaterial.

{¶24} For these reasons, the trial court properly denied Hunter's motion for an acquittal, and we overrule her first assignment of error.

### Jury Polling Not Plain Error

{¶25} In her second assignment of error, Hunter claims that the trial court erred when it failed to poll the jury at the conclusion of the case. Because Hunter failed to object when the trial court polled the jury after it received the verdict for Count 6, we will only reverse if the procedure below amounted to plain error. To notice plain error, we must first find that an error occurred, that the error was an obvious defect in the trial proceedings, and that the error affected the outcome of the trial. *State v. Payne*, 114

Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16; *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, 970 N.E.2d 891, ¶ 11.

{¶26} On the record before us, we cannot conclude that the decision to poll the jury prior to publication of the verdict was plain error. The Revised Code states that "[b]efore the verdict is accepted, the jury may be polled at the request of either the prosecuting attorney or the defendant." R.C. 2945.77. Similarly, Crim.R. 31(D) states that "[w]hen a verdict is returned and before it is accepted the jury shall be polled at the request of any party or upon the court's own motion." Neither the statute nor the rule requires that the jury verdict be read in open court prior to polling the jury.

{¶27} In support of her position, Hunter quotes a line from a 2003 decision of the Ohio Supreme Court, which says that "[a] verdict is final if (1) the deliberations are over, (2) the result is announced in open court, and (3) the jury is polled and no dissent is registered." *See State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 34, quoting *United States v. White*, 972 F.2d 590, 595 (5th Cir.1992). But *Williams* does not support Hunter's position.

{¶28} In *Williams*, the court addressed the question of whether a juror could recant his or her verdict at any time before it is journalized. *Williams* was a death-penalty case in which a juror had asked to recant her verdict on one of the counts after the guilt phase of the trial had concluded but before the penalty phase had begun. The *Williams* court began its analysis by stating that "[n]umerous cases hold that the verdict becomes final once the jury has been polled and each juror has assented to the verdict in open court." *Williams* at ¶ 34. The *Williams* court then quoted the *White* language cited by Hunter.

{¶29} The language cited as it relates to the requirement of publication prior to finality is dicta. It was not necessary to the court's analysis. And it is not found in the

syllabus of *Williams*, which simply states that "[o]nce a poll of the jurors has been completed and all have assented to the verdict, a juror may not thereafter rescind or modify his or her vote." *Id.* at syllabus. Additionally, the *Williams* court cited another federal appellate decision, which stated that "[a] verdict becomes immutable by the jury once announced in open court, or when it has been confirmed by a poll, if ordered." *Id.* at ¶ 35, quoting *United States v. Dakins*, 872 F.2d 1061, 1065 (D.C.Cir.1989).

{¶30} There is no reading of the rule or statute that requires that the jury be polled only after the verdict is announced in open court. In fact, the Eighth Appellate District has held that polling the jury before reading the verdict does not run afoul of Crim.R. 31(D), because the rule only requires the court to poll the jury for unanimity before accepting the verdict. *State v. Bradley*, 8th Dist. Cuyahoga No. 79354, 2002-Ohio-3895, ¶ 66.

{¶31} The Ohio Supreme Court has previously addressed the role of the jury poll. In 2000, the court stated

> [a] jury poll's purpose is to "give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented."

*State v. Hessler*, 90 Ohio St.3d 108, 121, 734 N.E.2d 1237 (2000), quoting *Miranda v. United States*, 255 F.2d 9, 17 (1st Cir.1958). The *Williams* court concluded that:

> the jury poll is well suited to serve as the benchmark of finality. The poll is a solemn ceremony whose formality signals the conclusive nature of the verdict to all who are present. The poll focuses each juror's attention on

11

the verdict and gives each a clear-cut opportunity to declare in open court her assent to or dissent from the [verdict].

*Williams* at ¶ 36.

{¶32} The procedure followed by the trial court did not violate any provision of Crim.R. 31(D) or R.C. 2945.77, and its use did not run afoul of the Ohio Supreme Court's view on the role and import of the jury poll. Therefore, the trial court did not commit plain error when it polled the jury prior to publication of the verdict. We overrule Hunter's second assignment of error.

**No Actionable Prosecutorial Misconduct**

{¶33} In her third assignment of error, Hunter claims that numerous instances of prosecutorial misconduct occurred during the state's closing argument that deprived her of a fair trial. We disagree.

{¶34} Generally, prosecutorial misconduct will not provide a basis for overturning a criminal conviction, unless, on the record as a whole, the misconduct can be said to have deprived the appellant of a fair trial. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). "The touchtone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The test is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

{¶35} A prosecuting attorney has wide latitude to summarize the evidence and zealously advocate the state's position during closing argument. *See State v. Richey*, 64 Ohio St.3d 353, 362, 595 N.E.2d 915 (1992). The propriety of a specific remark by a prosecutor must not be judged in isolation, but in light of the tenor and context of the

entire closing argument. *See State v. Slagle*, 65 Ohio St.3d 597, 607, 605 N.E.2d 916 (1992). In almost all of the instances cited by Hunter, there was no objection. She, therefore, has waived all but plain error. *See State v. D'Ambrosio*, 73 Ohio St.3d 141, 143-144, 652 N.E.2d 710 (1995).

{¶36} We have reviewed Hunter's argument, and the chart of 51 specific instances of alleged improper comment, from the perspective of not just the lengthy closing arguments presented by both sides, but also in light of the lengthy trial that preceded them. In many of the instances, Hunter's counsel opened the door to comments made by the state in rebuttal with his own closing remarks. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 145. Further, the trial court repeatedly admonished the jury that closing arguments are not evidence. *See State v. Simmons*, 1st Dist. Hamilton No. C-130126, 2014-Ohio-3695, ¶ 77 (reversal for questionable comments after lengthy trial not necessary because the jury was advised that the arguments are not evidence).

{¶37} The trial in this case was long and intense. The closing arguments of both sides were equally intense. And while some of the comments may have stretched the bounds of what is acceptable in closing arguments, the record does not support the conclusion that the arguments of the state deprived Hunter of a fair trial. Hunter's third assignment of error is overruled.

## Conclusion

{¶38} Hunter's conviction for having an unlawful interest in a public contract was based on sufficient evidence; therefore the trial court properly denied her motion for an acquittal. Further, the trial court did not commit plain error when it polled the jury after receiving the verdict for having an unlawful interest in a public contract but before it was publicized. And the state's comments during rebuttal closing argument did not

deprive Hunter of a fair trial.  Having considered and overruled all three assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**DEWINE, P.J.**, and **STAUTBERG, J.**, concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

