[No. G007980. Fourth Dist., Div. Three. Feb. 7, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DUKE KIMBERLY BOLTER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

_____

\* Pursuant to California Rules of Court, rule 976(b), parts II, III, IV, V, VI and VII of the Discussion are not published, as they do not meet the standards for publication.

## COUNSEL

Stephen S. Buckley, under apointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Rudolf Corona, Jr., and Tim Nader, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOORE, J.—Duke Kimberly Bolter and a codefendant, Daniel Leroy Hikes, were convicted in a joint trial of the first degree murder and robbery of Patricia Clayton. (Pen. Code, §§ 187, 211.) A special circumstance allegation that the murder occurred while Bolter was in the commission of a robbery was found to be true. (Pen. Code, § 190.2, subd. (a)(17)(i).) In a separate nonjury trial, the lower court determined Bolter had suffered a prior serious felony conviction. (Pen. Code, §§ 667, 1192.7, subd. (c).) The court sentenced Bolter to 25 years to life for murder, plus 5 consecutive years for the prior conviction.

In an earlier unpublished opinion this court affirmed the judgment against Hikes. (*People* v. *Hikes*, Feb. 28, 1989, G007349.) Bolter seeks reversal of the judgment against him on the grounds of lack of jury unanimity in entering the verdict, jury misconduct, insufficiency of the evidence, denial of his motion for severance, instructional error, and prosecutorial misconduct. Alternatively, Bolter argues the punishment imposed is disproportionate to his culpability and his codefendant's sentence, and requests the conviction be reduced to second degree murder. We affirm the judgment in its entirety.

## FACTS

Patricia Clayton was a prostitute and a drug user. Her circle of friends consisted largely of narcotics addicts who subsisted through a variety of criminal activities. The jury found two of these individuals killed her.

The events surrounding the murder unfolded as follows: Bolter and Hikes were arrested February 24, 1987, after they ran from an Orange County sheriff's deputy who suspected they were about to rob a liquor store in a shopping center. When the deputy first spotted them, Bolter was driving a red Mazda RX-7; Hikes was his passenger. The deputy found Bolter in the rear of a soft drink delivery truck parked behind one of the stores. Hikes was discovered cowering beneath a bush on a muddy hillside behind the shopping center.

The deputies impounded the Mazda, which contained contraband, including drug paraphernalia. It was registered to Clayton, but had not been reported stolen. The vehicle did not appear to have been hot-wired. During trial, Bolter's attorney essentially conceded his client hid the keys in a store in the shopping center, but no evidence was ever offered to that effect.

Police contacted Clayton's parents because the registration gave their address. Mr. and Mrs. Clayton knew their daughter's love for the Mazda was one positive constant in her life. She took extremely good care of the automobile. While Clayton allowed others to drive it, she usually rode along with them.

Since their daughter's telephone had been disconnected, Mr. and Mrs. Clayton went to her apartment to see if something was amiss. When no one answered the door, the Claytons entered with their key. The darkened apartment was not tidy, but nothing appeared out of the ordinary until Mr. Clayton looked in a bedroom closet: There he found his daughter's bludgeoned body.

The prosecution presented evidence establishing the following facts: No one had broken into Clayton's apartment. Signs of a struggle were evident in a hallway leading to the bedroom, however. The bedroom door lock had been forced violently, and a trail of blood and matted carpet led from the hall to the bedroom closet. Blood spatters, nicks, and scuff marks were also present on the hallway walls. A throw rug covered a large bloodstain on the hallway carpet; bedding in the master bedroom concealed a bloodstain there. Small fragments of wood were scattered throughout the apartment, and several were removed from the victim's hair and gaping wounds in her

head. Apart from a great deal of blood, there was also a quantity of vomit in the closet.

The evidence suggested Clayton attempted to barricade herself in her bedroom but had been beaten in the hallway and dragged from there to the bedroom closet. Bloodstains suggested the body had to have been moved by two persons by picking it up at both ends. Clothes piled outside the closet indicated a space had been made on the floor for her. Blood spatters on the closet walls above her head, as well as indentations, suggested she was also beaten there. The most likely weapon was a piece of scrap construction firewood. It was never found.

Clayton did not carry a purse. She generally dressed in men's clothing, carrying valuables in her pants pockets. Clayton's pockets were turned out. There was no cash, and her car keys were missing. Cocaine and morphine were in her system at the time of death, which a coroner's investigator estimated was early in the morning on February 23. Other evidence suggested the early evening of Sunday, February 22 might be more likely.

Blood spatters were found on the lower right leg of the jeans Hikes was wearing at the time of his arrest. The spatter pattern was consistent with that of the stains on the walls in Clayton's hallway. The blood in both locations was also consistent with Clayton's type, but it was not consistent with either Hikes's or Bolter's blood, with one exception. A larger bloodstain in the knee area of Hikes's Levis contained elements consistent with both his and the victim's blood and could not have been completely contributed by either of them. Stains consistent with the victim's blood were also found on a blue shirt left in a hamper at a house Bolter frequently shared with his girlfriend and her mother and brother.

No fingerprints belonging to either defendant were found in the victim's apartment. There was some evidence that the scene had been wiped to eliminate prints.

According to neighbors, Clayton arrived home during the afternoon of February 22 in a Cadillac with an older man. The evidence suggested he was a prostitution client. At that time Clayton's car was not in the driveway where she usually parked. The jury could have surmised it was parked near her usual stand on Harbor Boulevard in Anaheim or Garden Grove.

Clayton was next seen arriving home at approximately 4:30 p.m. the same day driving her own car and in the company of Hikes and Bolter. Other than by her killers, Clayton was never seen alive again.

Neighbors noticed the victim's car was gone several hours later, but heard no unusual sounds from her apartment. Although Clayton usually left the bathroom light on all night, it was not on the night of February 22.

Clayton had been in contact with Bolter for several weeks before her death. Bolter's girlfriend was Karen Tomka, Clayton's friend and a fellow drug user. In early February, Clayton and Tomka drove to Northern California to pick up Bolter upon his release from prison. Several days later, Tomka herself was incarcerated in Los Angeles. Bolter actively sought her release on bail. But he had no car and was short of cash.

Clayton planned to drive Bolter to the jail on Saturday, February 21, but was unable to do so. Bolter spoke with Tomka by telephone on that date and, presumably, the following afternoon as well. A 20-minute collect call from Sybil Brand Institute was made to Tomka's parents' home while Bolter was there, approximately three hours before Bolter and Hikes were seen entering the apartment with the victim.

Before noon on Sunday, February 22, Hikes took his estranged wife's car keys. He returned them to police officers she summoned to assist her.

Bolter presented a number of witnesses to his whereabouts on February 22 and February 23. A waitress at a restaurant saw Bolter on February 22 sometime between 4:30 p.m. and 7:45 p.m. He was alone. At 8 p.m. he arrived at the home of friends where he spent the night. On February 23 Bolter and Hikes visited an acquaintance in Perris. They arrived between 2 p.m. and 3 p.m. and stayed until 11 p.m. At midnight they went to the same home where Bolter had spent the previous evening and they returned to Perris at approximately 3 a.m. on February 24. Those who saw Bolter on February 23 did not see Clayton's car.

Defense experts testified the blood on Hikes's trousers contained a higher concentration of morphine than the victim's autopsy blood. Defense counsel argued this indicated the spatters on Hikes's pants came from the victim's syringe during the process of clearing blood from the needle during or after an injection of narcotics. But there were several arguable flaws in the defense experts' results. A control sample from Hikes's jeans without a blood spot was lost when a container broke during testing, and only one blood spot was tested. Also, a prosecution criminalist using more sensitive equipment and multiple samples from the pants was unable to duplicate the defense finding.

## DISCUSSION

### I.  UNANIMITY OF THE VERDICT

■  Without citing any supporting authority, Bolter contends the lower court erred by failing to adequately investigate an alleged attempt by one juror to recant her guilt phase verdict thereby rendering it less than unanimous. This contention is not supported by the record or the law.

The facts relevant to the issue are as follows: during the trial's penalty phase the court received two notes from Juror Baker. The first note reflected Baker had "definite concerns about this trial" and the jury's prior "decision." Baker asked to speak with the judge or give him a "more detailed note."

Upon inquiry outside the presence of the other jurors, Baker submitted the second note which said: "What I'm hoping for is reassurance that we made the right decision concerning the robbery/special circumstance charges against Duke Bolter. [¶] We as the jury spent alot [*sic*] of time reading and re-reading the instructions provided by you during deliberations. I am having a very hard time staying convinced that we understood and applied the instructions correctly. [¶] I get very little sleep on the nights prior to reporting to court. Would it be at all possible to speak with you confidentially?"

Because of Juror Baker's concerns, the court suggested and counsel agreed to settle the issues that were to be determined at the penalty phase. The prosecutor withdrew the request for the death penalty as to Hikes and moved to strike the special circumstance as to Bolter. The motion was granted. The court discharged the jurors, explaining, "[w]hat happened was Miss Baker indicated to us that she . . . felt unsettled about her verdict, and it was understandable because of the peculiarity of the law regarding the difference between special circumstance robbery and murder and felony murder where there's a robbery and murder and then the taking of property thereafter."

First, Bolter's argument that the communications from Juror Baker reflected misgivings about the first degree murder verdict, in addition to reservations concerning the felony murder special circumstance finding, is not well taken. There was never any question Baker's reservations concerned the finding on the special circumstance as to Bolter. During the proceedings involving Baker's notes, Bolter's counsel acknowledged he "chose to argue guilt or innocence without explaining the law on special circumstances intent, and . . . that obviously was a mistake . . . because

it's confusing law—[the] difference between first degree felony murder and special circumstances . . . ." Neither counsel nor the court felt Ms. Baker's communications warranted inquiry into her feelings about the verdict of guilt. Such determination was appropriate.

Second, even assuming Baker did express misgivings about the jury's murder verdict against Bolter, the lower court lacked jurisdiction to reconvene the jury and direct them to continue their deliberations on guilt once the trial's penalty phase had begun. ■ " 'Once a "complete" verdict has been rendered per [Penal Code] section 1164 [i.e., a verdict that has been received and read by the clerk, acknowledged by the jury, and recorded] and the jurors discharged, the trial court has no jurisdiction to reconvene the jury regardless of whether or not the jury is still under the court's control [citation]. However, if a complete verdict has not been rendered [citations] or if the verdict is otherwise irregular [citations], jurisdiction to reconvene the jury depends on whether the jury has left the court's control. If it has, there is no jurisdiction [citations]; if it hasn't, the jury may be reconvened [citations].' " (*People* v. *Hendricks* (1987) 43 Cal.3d 584, 597 [238 Cal.Rptr. 66, 737 P.2d 1350], quoting from *People* v. *Thornton* (1984) 155 Cal.App.3d 845, 855 [202 Cal.Rptr. 448]. See also *People* v. *Bonillas* (1989) 48 Cal.3d 757, 770-771 [257 Cal.Rptr. 895, 771 P.2d 844].)

*People* v. *Hendricks, supra,* 43 Cal.3d 584 expressed two reasons for this rule. "First, in cases in which the jury renders a complete verdict, the rule is designed to protect the verdict as an operative fact . . . . ' ". . . The office of a juror is discharged upon the acceptance of his verdict by the court." ' [Citation.] [¶] Second, *in all cases—and therefore fundamentally*—the rule is designed to guarantee a fair trial, controlled by the court and shielded from outside influences . . . . '. . . Once freed, the jurors can properly discuss the case with the district attorney and the People's witnesses, they can read about it in the media and they can entertain "facts" or opinions about it from any source . . . .' " (*Id.* at p. 597, italics added.)

■ Here, the jury unquestionably returned a complete verdict at the end of the trial's guilt phase. When polled as to their verdicts and findings, all 12 jurors, including Baker, gave affirmative responses to inquiries about Bolter's guilt of murder in the first degree and the finding of true as to the special circumstance accompanying that charge. Accordingly, the clerk entered the verdicts and findings. The only irregularity in the verdict, if it can be called that, was Juror Baker's subsequent expression of misgivings. Assuming the verdict was irregular, the question posed is whether the trial judge still had jurisdiction to resubmit the issue of Bolter's guilt to the jury. The answer is no.

In capital cases, as this one was until the prosecution withdrew its request for the death penalty against Hikes and requested the court strike Bolter's felony murder special circumstance, the jury remains within the court's control after the initial guilt phase is completed. (*People* v. *Turner* (1990) 50 Cal.3d 668, 701 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Bonillas, supra*, 48 Cal.3d at p. 773.) Accordingly, the court generally has jurisdiction to reconvene the jury to correct an incomplete or irregular verdict. (*Ibid.*)

But an exception to this rule exists where the court has already commenced the trial's penalty phase. In *People* v. *Hughes* (1959) 171 Cal.App.2d 362 [340 P.2d 679], the jury returned a verdict of guilty to a charge of murder, but failed to specify the degree as required by Penal Code section 1157. After the penalty phase commenced and evidence was introduced, the court requested the jury deliberate further on the degree of the crime.

In reducing the defendant's conviction to second degree murder, the Court of Appeal stated: "When during the trial of the issue of penalty the court endeavored to 'correct' the verdict on 'guilt' what was done was, in point of fact, a resubmission to the jury of the issue of degree. In a very essential way this was a retrial of the issue of guilt in violation of the specific provision of [former] Penal Code, section 190.1, that, 'the issue of guilt shall not be retried by such jury.' Furthermore, it was a retrial of the issue of guilt after the jury had heard much evidence, inadmissible on that issue, and damaging to appellant . . . ." (171 Cal.App.2d at pp. 369-370.)

In *People* v. *Bonillas, supra*, 48 Cal.3d 757, the Supreme Court reviewed *Hughes*, criticizing the opinion's reference to the jury's " 'release' " after returning a "complete" verdict at the end of the trial's guilt phase. Nonetheless, *Bonillas* approved the decision's holding. "On the specific facts of the case, i.e., that the penalty phase trial had commenced and evidence admissible only at the penalty phase had been introduced, the court's statement was correct in substance. The guilt phase verdict was required to be treated as complete and the guilt portion of the trial ended when the jury began considering the penalty phase evidence, inadmissible at the guilt phase." (*Id.* at p. 774.) In *Bonillas*, the Supreme Court concluded the procedural events in *Hughes* compelled the same result as when a jury is discharged: "It was, rather, the commencement of the penalty phase trial and the receipt of penalty phase evidence which had the *same effect* as a discharge: the 'incalculable and irreversible'. effect of exposing the jury to improper influences. Thus, the guilt phase ended when the penalty phase commenced, and it was thereafter too late to permit the jury to complete its guilt phase verdict." (*Id.* at p. 774.)

██ Here, after the trial's penalty phase began the lower court lost its ability to shield the jury from improper influences relating to the issue of guilt. The penalty phase included the introduction of evidence on Bolter's earlier commission of an armed robbery and character witnesses. While, unlike *People* v. *Hughes, supra,* 171 Cal.App.2d 362, the statutes covering capital cases no longer provide the "issue of guilt shall not be retried" (former Pen. Code, § 190.1), that is not controlling. The objectives of each phase, including the issues and evidence to be considered, are still different. ██ For example, while the jury is instructed at the guilt phase it "must not be influenced by mere . . . sympathy" (CALJIC No. 1.00), the use of that instruction during the penalty phase could be error under certain circumstances. (See *People* v. *Brown* (1988) 45 Cal.3d 1247, 1256 [248 Cal.Rptr. 817, 756 P.2d 204]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 777 [239 Cal.Rptr. 82, 739 P.2d 1250].)

██ Therefore, we reject Bolter's claim the lower court erred by failing to further investigate juror Baker's misgivings concerning her verdict on the trial's guilt phase.

II.- VII.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed.

Sonenshine, Acting P. J., and Crosby, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 18, 1991.

---

* See footnote, *ante,* page 653.