[No. B108078. Second Dist., Div. Four. June 29, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ALLEN BENTO et al., Defendants and Appellants.

COUNSEL

Barbara A. Smith and Marilyn S. White-Redmond, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**VOGEL (C. S.), P. J.—**

RELEVANT PROCEDURAL BACKGROUND

On September 9, 1996, an amended information was filed against appellants Anthony Ternell Johnson and Richard Allen Bento. Count 1 charged appellants with first degree murder. (Pen. Code, § 187.) Count 2 charged appellants with attempted willful, deliberate, and premeditated murder. (Pen. Code, §§ 664, 187.) Counts 1 and 2 also alleged that both appellants were armed with a firearm. (Pen. Code, § 12022, subd. (a)(1).) Count 3 charged Bento with robbery (Pen. Code, § 211), and counts 4 and 5 charged Bento with assault with a firearm (Pen. Code, § 245, subd. (a)(2)). Counts 3 through 5 also alleged that Bento personally used a firearm. (Pen. Code, §§ 1203.06, subd. (a)(1), 12022.5, subd. (a).) Finally, the information alleged that Johnson had suffered a prior felony conviction. (Pen. Code, § 667, subd. (a)(1).) Appellants pleaded not guilty and denied the special allegations.

Trial by jury commenced on September 12, 1996. On September 30, 1996, the jury found Johnson guilty on counts 1 and 2, and found true the

allegations that he was armed pertaining to these counts. The jury was deadlocked with respect to counts 1 and 2 against Bento, but found Bento guilty of counts 3 through 5, and found true the use allegations pertaining to these counts. The trial court declared a mistrial with respect to counts 1 and 2 against Bento.

Pursuant to a plea agreement, Bento subsequently withdrew his plea of not guilty as to count 1, and pled no contest to voluntary manslaughter. (Pen. Code, § 192, subd (a).) Count 2 against Bento was dismissed.

On November 25, 1996, the trial court found true the prior serious felony allegation against Johnson, and sentenced him to prison for a total term of 34 years to life, plus life with the possibility of parole. On December 2, 1996, the trial court sentenced Bento to prison for a total term of 12 years. These appeals followed.

FACTS

A. *Prosecution Evidence*

In June 1993, appellant Johnson was a member of the 84 Swan Blood gang. He had a tattoo across his front torso that stated "Bloodline," a mark of Blood gang affiliation. Appellant Bento was then also affiliated with the 84 Swans.

Robert Smith lived with his brother and grandmother, Sara Roberson, at 222 East 82d Place in Los Angeles. Smith was a member of a gang known as the Main Street Crips, and his moniker was "Little Tony Rhone." Smith's brother was also a member of the same gang and was known as "Little Fox."

The Main Street Crips and the 84 Swans had been engaged in an active feud. The Main Street Crips gang color is blue, and the 84 Swans gang color is red. Smith's house was on the border between Blood and Crip gang territory.

Chester Finley lived across the street from Smith. Finley had been a member of a gang known as the 20 Outlaws, but was then affiliated with the 84 Swan Blood gang. Finley knew appellant Johnson, and also knew of appellant Bento under the nickname "Pookie."

On June 13, 1993, Smith was at home with Sara Roberson. Hironori Thomas James and a young woman named "Danny" drove to Smith's house

in a green four-door Pinto and arrived at approximately 9 p.m. James, known to Smith as "Pookie," was another member of the Main Street Crips and was wearing blue and yellow clothing.

James testified as follows: After James and Danny entered Smith's house, James returned to the Pinto, where he sat in the passenger seat, smoking a cigar and playing the radio. Johnson approached the driver's window of the Pinto and asked, "Hey, man. Is Fox in there?"[1] James responded, "No, he's not." Johnson walked away from the car towards the house and then lifted up his shirt. James dove under the Pinto's steering wheel. James heard several shots and glass flew inside the Pinto. When the shooting stopped, James fled the car and ran to his own home.

Smith testified that after a pause in the shooting, he and his grandmother went to the front door of the house to check on James. As Smith opened the door, he saw three shadows and the shooting resumed. Smith retreated from the front door and discovered that his grandmother had been shot. Sara Roberson eventually died from a gunshot wound to her torso.

Finley testified that at some point during the evening of June 13, 1993, Finley encountered Johnson and Bento at a liquor store at 82d Street and San Pedro. Johnson indicated to Finley that he had been involved in a shooting at Smith's house and that he had tried to shoot Fox. Johnson asked Finley to let him know if Johnson's name came up in connection with the shooting.

In June 1993, Hugo Echeverria lived near 83d Street and Avalon, approximately four blocks from Smith's house. At approximately 10 p.m. on the same evening, Echeverria, Ivonne Ortiz, and Jose Alaniz were in an alley near Echeverria's residence, listening to music from a radio in Echeverria's Camaro. Bento approached, fired a gun three times into the air, announced that he was taking the Camaro, and pointed his gun at the group. He then drove the Camaro down the alley to 83d Street.

Echeverria and several friends followed the Camaro in a truck but lost sight of it. When they returned to 83d Street, they found the Camaro parked on 83d Street, approximately two blocks from Echeverria's residence. Echeverria saw Bento and another person at a nearby corner, where they entered a car that had pulled up.

---

[1]There was evidence that another member of the Main Street Crips not living at Smith's house was nicknamed "Fox."

At approximately the same time, Juan Trujillo Curiel exited his house in the vicinity of 83d Street and saw a Camaro stop near his house.[2] The car's passenger tried to enter Curiel's yard, but Curiel denied him entry. The passenger grabbed something from the car's interior and walked to some bushes. The passenger and driver then walked away. Several Hispanic men soon arrived in a truck and expressed surprise at finding the Camaro. Curiel discovered a weapon where the passenger had walked.

Police later found a nine-millimeter handgun in the bushes near Curiel's house. Tests indicated that 11 casings and 2 bullets found at Smith's house had been fired from the recovered handgun. Four .32-caliber casings and one .32-caliber bullet were also discovered at Smith's house. No identifiable fingerprints were found on the nine-millimeter handgun. No identifiable fingerprints on the Camaro matched Johnson's or Bento's fingerprints.

Finley did not give any information to the police concerning the shooting at Smith's house until the summer of 1995, when Finley identified Johnson from two photographic "six packs" and mentioned the name "Pookie." At trial, Finley testified that he did not contact the police earlier because he had been addicted to drugs, and that he came forward when his conscience troubled him and he realized that the victim could have been his elderly mother, who resided in the area.

James also did not give police any information until the summer of 1995. He testified that he did not assist the police because he was afraid. In July 1995, a police officer in Kansas City showed James a laser copy of a photographic six pack including Johnson's picture, but James was unable to identify anyone. Several days later, he identified Johnson when he was shown the original six pack, and he gave two statements concerning Johnson's involvement in the shooting. At trial, James attributed his original inability to identify Johnson to the poor color quality of the laser copy.

One day before Curiel testified at trial, he was shown a photographic six pack and identified Bento as resembling the Camaro's passenger. At trial, Curiel identified Johnson as the Camaro's passenger.

B.  *Defense Evidence*

Bento presented no evidence on his behalf. Johnson presented the following evidence:

On September 13, 1993, Curiel was shown photographic six packs containing pictures of Johnson and Bento, but he was unable to identify either appellant.

---

[2]Curiel testified this was his full name, although he is often called "Juan Trujillo" in the record.

A police report stated that Finley had told the police that he was at 83d and Town when Johnson, who was drinking with some people, told Finley that he had been involved in the shooting.

When Detective Thomas Mathew first interviewed James in July 1995, James indicated that one of his reasons for not approaching the police was that he believed he was wanted by the police, but Mathew did not record this statement in his report. Myra Thomas, a defense investigator, testified that James told her that he had believed there was a warrant for his arrest, and he also indicated that he understood that Mathew would take care of the warrant.

The parties stipulated that Finley was on felony probation on June 7, 1995, and that he remained on felony probation at the time of his testimony.

## DISCUSSION

### A. Johnson's Appeal

Johnson contends that (1) the trial court erred in refusing to reconvene the jury, (2) insufficient evidence supports Johnson's convictions, and (3) the trial court improperly excluded evidence concerning Finley's credibility.

#### 1. Refusal to Reconvene Jury

Johnson contends that the trial court improperly refused to reconvene the jury after a juror expressed doubts about the verdict. We disagree.

"Every criminal defendant is entitled to a unanimous verdict. (Cal. Const., art. I, § 16; *People v. Wheeler* (1978) 22 Cal.3d 258, 265 . . . .) And to be valid a criminal verdict must express the independent judgment of each juror. (See *People v. Gainer* (1977) 19 Cal.3d 835, 848-849 . . . .)" (*Chipman v. Superior Court* (1982) 131 Cal.App.3d 263, 266 [182 Cal.Rptr. 123].)

With regard to these matters, Penal Code section 1163 provides: "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if any one answer in the negative, the jury must be sent out for further deliberation." Furthermore, Penal Code section 1164 provides: "(a) When the verdict given is receivable by the court, the clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent

out; but if no disagreement is expressed, the verdict is complete, and the jury shall, subject to subdivision (b), be discharged from the case. [¶] (b) No jury shall be discharged until the court has verified on the record that the jury has either reached a verdict or has formally declared its inability to reach a verdict on all issues before it, including, but not limited to, the degree of the crime or crimes charged, and the truth of any alleged prior conviction whether in the same proceeding or in a bifurcated proceeding."

██    As our Supreme Court explained in *People* v. *Hendricks* (1987) 43 Cal.3d 584, 597 [238 Cal.Rptr. 66, 737 P.2d 1350], trial courts may in some circumstances lack authority to reconvene the jury: "'Once a "complete" verdict has been rendered per [Penal Code] section 1164 [i.e., a verdict that has been received and read by the clerk, acknowledged by the jury, and recorded] and the jurors discharged, the trial court has no jurisdiction to reconvene the jury regardless of whether or not the jury is still under the court's control [citation]. However, if a complete verdict has not been rendered [citations] or if the verdict is otherwise irregular [citations], jurisdiction to reconvene the jury depends on whether the jury has left the court's control. If it has, there is no jurisdiction [citations]; if it hasn't, the jury may be reconvened [citations].' [Citation.]" (*People* v. *Hendricks, supra,* 43 Cal.3d at p. 597, quoting *People* v. *Thornton* (1984) 155 Cal.App.3d 845, 855 [202 Cal.Rptr. 448].)

Here, after four days of deliberations, the jury announced that it had reached a verdict on each count against Johnson, but only on counts 3 through 5 against Bento. The jury's verdicts concerning Johnson were read in open court, and the jurors, when polled, unanimously affirmed that the verdicts as read were their own. The trial court then verified on the record that the jurors had reaffirmed their verdicts and directed the clerk to record these verdicts. Subsequently, the trial court read the verdicts on counts 3 through 5 against Bento in open court, the jury was polled about these verdicts, and the verdicts against Bento were recorded.

Several minutes later, while counsel and the trial court were discussing the remaining counts against Bento, Juror No. 7 requested a conference with the trial court. At this conference, Juror No. 7 stated: "I'm not absolutely sure with reasonable doubt, even though I have tried to be, on counts 1 and 2 on Mr. Johnson." The trial court noted that 12 to 15 minutes had passed since the jury had been polled on the verdicts concerning Johnson, and that during that interval Johnson had been weeping openly. In response to the trial court's questions, Juror No. 7 stated that her mind had been "going back and forth" during the polling on the verdicts concerning Johnson and that she had thought the polling was about Bento. Following this exchange, the trial court

declined to reconvene the jury, reasoning that the verdicts against Johnson had been recorded after the members of the jury had collectively and individually affirmed them, including Juror No. 7, who had voiced no confusion or dissent during the polling.

■ The first issue presented is whether the verdicts against Johnson were complete within the meaning of Penal Code section 1164 when they were recorded. Generally, a verdict is complete under section 1164 if it has been read and received by the clerk, acknowledged by the jury, and recorded. (*People* v. *Hendricks, supra*, 43 Cal.3d at p. 597.) However, a verdict is not complete if a juror dissents during polling (*People* v. *Green* (1995) 31 Cal.App.4th 1001, 1009-1010 [38 Cal.Rptr.2d 401]), it does not resolve a count charged (*People* v. *Hernandez* (1985) 163 Cal.App.3d 645, 656-657 [209 Cal.Rptr. 809]), or it does not make a required finding (*Gray* v. *Superior Court* (1989) 214 Cal.App.3d 545, 549-552 [262 Cal.Rptr. 672]).

Here, the verdicts resolved all requisite matters concerning Johnson, the jurors collectively and individually affirmed the verdicts in open court, and the trial court verified the verdicts and directed the clerk to record them. Throughout this sequence of events, the requirements of Penal Code sections 1163 and 1164 were followed in every detail, and the verdicts were free from procedural irregularities when recorded. The verdicts were therefore complete under section 1164. (*People* v. *Bolter* (1991) 227 Cal.App.3d 653, 660 [278 Cal.Rptr. 123] [verdict is complete in guilt phase of bifurcated trial when all 12 jurors affirm verdict and special findings and the clerk records the verdict and special findings].)

The second issue is whether the trial court retained jurisdiction to reconvene the jury within the meaning of the rules summarized in *People* v. *Hendricks, supra*, 43 Cal.3d at page 597. No case has squarely addressed whether a trial court has such jurisdiction to reconvene the jury when, as here, a juror wishes to reconsider his or her verdict after the verdict is complete within the meaning of Penal Code section 1164, but *before* the jury has been discharged. The case closest to point is *People* v. *Peavey* (1981) 126 Cal.App.3d 44, 46-49 [178 Cal.Rptr. 520], in which a juror announced that she wanted to change her verdict after the verdict was complete under section 1164 *and* the jury had been discharged, but the jury had not left the jury box. The court in *Peavey* affirmed the trial court's refusal to reconvene the jury, reasoning that the trial court lacked jurisdiction to do so. (*People* v. *Peavey, supra*, 126 Cal.App.3d at p. 49.)

We find guidance on this issue in *People* v. *Bonillas* (1989) 48 Cal.3d 757 [257 Cal.Rptr. 895, 771 P.2d 844] and *People* v. *Bolter, supra*, 227

Cal.App.3d 653. In *Bonillas*, our Supreme Court clarified that where, as in *Peavey*, the verdict is complete, the trial court loses control over the jury as soon as the jury is discharged, and it emphasized the loss of such control as a key consideration in the termination of jurisdiction. (*People* v. *Bonillas*, *supra*, 48 Cal.3d at pp. 771-772, fns. 5 & 6.) The significance of discharging the jurors stems from the fact that once discharged, jurors have " 'thrown off their characters as jurors . . . ,' " and are " 'free from any official obligation.' [Citation.]" (*Id.* at p. 771, quoting *People* v. *Lee Yune Chong* (1892) 94 Cal. 379, 384 [29 P. 776].) Thus, discharge " 'results in sending the jurors back to the outside world freed of all the admonitions that previously guarded their judgments from improper influences." (*People* v. *Bonillas*, *supra*, 48 Cal.3d at p. 771, quoting *People* v. *Thornton*, *supra*, 155 Cal.App.3d at p. 856.)

In *People* v. *Bolter, supra*, 227 Cal.App.3d at pages 659-662, a case involving a bifurcated murder trial, the jury returned a verdict of guilty and proceeded to hear evidence during the penalty phase of trial. A juror then indicated that she was inclined to change her mind about the guilty verdict. (*Id.* at p. 659.) The court in *Bolter* concluded that the verdict of guilty was complete, and the trial court did not err in failing to investigate the juror's change of mind because it lacked jurisdiction to reconvene jury deliberations on guilt. (*Id.* at p. 660.) The *Bolter* court reasoned that the trial court had lost the ability to shield the jurors from improper influences when they were exposed to new evidence pertinent to guilt during the penalty phase, and thus the presentation of this evidence " 'had the same effect as a discharge[.]' " (*Id.* at p. 661, italics omitted, quoting *People* v. *Bonillas*, *supra*, 48 Cal.3d at p. 774.)

Here, the trial court had not discharged the jury, and the jury had not been exposed to new evidence concerning guilt or similar influences. We conclude that the trial court retained jurisdiction over the jury within the meaning of the *Hendricks* principles.

The key issue, therefore, is whether Juror No. 7's expression of dissent after the verdicts were complete required the trial court to reconvene the jury. "[A]ny juror is empowered to declare, up to the last moment, that he dissents from the verdict. (See *Fitzpatrick* v. *Himmelmann* (1874) 48 Cal. 588, 590.) When this occurs, the jury must be sent out for further deliberation. (Pen. Code, §§ 1163, 1164.)" (*Chipman* v. *Superior Court, supra*, 131 Cal.App.3d at p. 266.)

Simply put, the issue presented here is whether the "last moment" for a juror to express dissent expires when the verdict is complete, rather than

when the trial court discharges the jury or otherwise loses its ability to shield the jury from outside influences. This issue is again one of first impression in California,[3] but has been addressed in two out-of-state jurisdictions.

The Arizona Rules of Criminal Procedure provide that the jury's verdict must be returned in open court, and prior to the jury's discharge it may be polled at the request of any party or on the trial court's own motion. (Ariz. Rules Crim. Proc., rules 23.1a, 23.4.) If the jury's responses upon polling do not support the verdict, the trial court may require them to continue deliberations or discharge them. (Ariz. Rules Crim. Proc., rule 23.4.) However, if no juror dissents from the verdict, the jury is to be discharged once the verdicts have been recorded. (See Ariz. Rules Crim. Proc., rule 22.5a.)

In *State* v. *Kiper* (1994) 181 Ariz. 62, 67-68 [887 P.2d 592, 597-598], the jury returned guilty verdicts in open court on all charges against the defendant, and affirmed their verdict during polling. The jurors were not discharged after the verdicts were recorded because they were to hear evidence on the state's allegations of prior convictions. (*Ibid.*) Shortly after the verdicts were recorded, the defendant stipulated to these allegations, but before the jurors were discharged, a juror sent the trial court the following note: "I was the juror that hung this jury ever since deliberations started. I then changed my vote today but am presently emotionally upset and at the reading of the verdicts I couldn't look at [the defendant] and wanted to say stop." (*Id.* at p. 68 [887 P.2d at p. 598].) The trial court declined to investigate the juror's change of mind and discharged the jury. (*Ibid.*)

The appellate court in *Kiper* affirmed, citing *U.S.* v. *White* (5th Cir. 1992) 972 F.2d 590, 595, certiorari denied 507 U.S. 1007 [113 S.Ct. 1651, 123 L.Ed.2d 272] (1993), for the proposition that a verdict is final "if (1) the deliberations are over, (2) the result is announced in open court, and (3) the jury is polled and no dissent is registered. [Citations.]" (*State* v. *Kiper*, *supra*, 181 Ariz. at p. 68 [887 P.2d at p. 598].) The *Kiper* court concluded that the jury's verdicts became final when they were affirmed in open court and recorded pursuant to the Arizona Rules of Criminal Procedure, and thus the trial court properly rejected the juror's attempt to impeach a final verdict by reference to the juror's subjective thought processes. (*Id.* at pp. 68-69 [887 P.2d at pp. 598-599].)

Under the Federal Rules of Criminal Procedure, verdicts must be unanimous and returned in open court. (Fed. Rules Crim.Proc., rule 31(a), 18

---

[3]In *People* v. *Bolter, supra*, 227 Cal.App.3d at pages 659-662, the court concluded that the guilt phase verdicts were complete, but it affirmed the trial court on the ground that the trial court had lost jurisdiction to reconvene the jury under the principles stated in *Hernandez* and clarified in *Bonillas*.

U.S.C.) Before the jury is discharged, it may be polled at the request of any party or on the trial court's own motion, and if any juror dissents from the verdict the trial court may require further deliberations or discharge the jury. (Fed. Rules Crim. Proc., rule 31(d), 18 U.S.C.)

In *U.S.* v. *White, supra,* 972 F.2d 590, the defendant was charged with simple possession of cocaine and conspiracy to possess cocaine. After deliberating, the jury indicated that it had reached a verdict on the possession charge, but not on the conspiracy charge. (*Id.* at p. 594.) After the verdict on the possession charge was collectively and individually affirmed in open court and recorded, the trial court directed the jury to continue deliberations on the conspiracy charge. (*Ibid.*) During the renewed deliberations, the trial court granted the jury's request to reconsider its verdict on the possession charge. (*Ibid.*) The jury then returned guilty verdicts on both charges. (*Ibid.*) The court in *White* concluded that the trial court erred in permitting the jury to reconsider its earlier verdict, reasoning that under the Federal Rules of Criminal Procedure the verdict became final once the verdict had been announced in court and unanimously affirmed during polling. (*Id.* at p. 595.)

Given the express language in Penal Code section 1164 and the close resemblance of sections 1163 and 1164 to the rules at issue in *Kiper* and *White,* we conclude that when, as here, the verdicts have been collectively and individually confirmed in open court pursuant to these sections and are complete in every detail, jurors are no longer empowered to dissent from the verdicts, and the trial court may not reconvene the jury for further deliberations on the basis of such dissent. In our view, sections 1163 and 1164 describe a culminating formal procedure for verifying the unanimity of the jury in open court, and thus they define the moment of transition for when a juror may and may not withdraw his or her affirmation of the verdict. Before the verdict is complete within the meaning of these sections, a juror's expressions of doubt or confusion mandate further deliberations. After the passing of this moment, such expressions are an impermissible attempt to impeach the verdict. In this respect, sections 1163 and 1164 define the final moment of the jury's deliberative process.

This conclusion finds some additional support in *People* v. *Peavey, supra,* 126 Cal.App.3d 44 and *People* v. *Romero* (1982) 31 Cal.3d 685 [183 Cal.Rptr. 663, 646 P.2d 824]. In *Peavey,* the court cited concerns about improper juror impeachment as an additional basis for affirming the trial court's refusal to reconvene the jury, reasoning that because the verdict was complete before the juror's renunciation, "it [was] irrelevant whether her statements were offered either two minutes or two weeks thereafter." (*People* v. *Peavey, supra,* 126 Cal.App.3d at p. 51.) In *Romero,* after the jury's

verdict was complete and the jury had been discharged, several jurors submitted affidavits alleging that the verdicts did not accurately represent the jury's voting. (*People* v. *Romero, supra,* 31 Cal.3d at p. 688.) The Supreme Court concluded that "[a] strict rule against belated impeachment in cases of alleged clerical error . . . comports with settled law in California," reasoning, inter alia, that Penal Code section 1164 "embodies the no-correction rule," and that the words of this statute " 'are clear and unequivocal.' " (*People* v. *Romero, supra,* 31 Cal.3d at pp. 693, 694, quoting *People* v. *Grider* (1966) 246 Cal.App.2d 149, 152 [54 Cal.Rptr. 497].) Here, Juror No. 7's remarks about her state of mind amounted to an improper attempt to impeach final verdicts by reference to her subjective thought processes (*People* v. *Romero, supra,* 31 Cal.3d at pp. 690-695), and they did not mandate renewed jury deliberations.

We recognize that in *People* v. *Bonillas, supra,* 48 Cal.3d at page 774, the court observed that the functions of the jury do not cease until there is " 'final assent followed by a discharge' " (quoting *People* v. *Lee Yune Chong, supra,* 94 Cal. at p. 385, italics omitted) and that the trial court " 'can, at any time while the jury are before it, and under its control, see that [the verdict] is amended in form so as to meet the requirements of the law.' [Citation.]" (*People* v. *Bonillas, supra,* at p. 772, italics omitted, quoting *People* v. *Jenkins* (1880) 56 Cal. 4, 7.) However, with one exception, the cases cited by the *Bonillas* court in support of these propositions, like *Bonillas* itself, addressed factual situations involving incomplete or facially imperfect verdicts. (*People* v. *Bonillas, supra,* 48 Cal.3d at p. 773 [renewed jury deliberations after jury returns incomplete verdict]; *People* v. *Lee Yune Chong, supra,* 94 Cal. at pp. 383-384 [same]; *People* v. *Jenkins, supra,* 56 Cal. at p. 7 [renewed jury deliberations after jury returns informal verdict inconsistent with instructions]; *People* v. *Fisher* (1948) 86 Cal.App.2d 24, 29-31 [194 P.2d 116] [trial court removes surplusage from written verdict during return of verdict with jury's approval]; *People* v. *Powell* (1950) 99 Cal.App.2d 178, 180-181 [221 P.2d 117] [renewed jury deliberations after jury returns incomplete verdict and trial court erroneously concludes that jury is deadlocked].) In the sole cited case involving a complete verdict, *People* v. *Grider, supra,* 246 Cal.App.2d at pages 150-154, the court concluded that the trial court erred in reconvening the jury because the jurors had been discharged and were mingling with the public when the trial court directed them to resume deliberations. Hence, none of the cited cases involved a situation factually similar to the circumstances before us.

In our view, the statements in *Bonillas* stand for the proposition that jurors are under official obligations prior to discharge, and they may be reconvened when their verdict is incomplete provided that the trial court has not lost

control over them. However, the discharge of the jury is simply a final and mechanical occurrence once the verdict is complete. In the present matter, the verdicts were complete as to Johnson, and this trial court thus lacked the authority to permit a juror to impeach the verdict.

In sum, the trial court did not err in declining to reconvene the jury.

### 2. *Substantial Evidence*

■ Johnson contends that insufficient evidence supports the judgment. " 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of that facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

The record discloses ample evidence to support the jury's verdicts with respect to the counts against Johnson. James identified Johnson as the person who approached him seeking Fox and who fired shots at the car in which James was sitting, and Finley testified that Johnson admitted involvement in the shooting. Upon this evidence, the jury could have concluded that Johnson had attempted to murder James and had murdered Sara Roberson.

Johnson here challenges this evidence at length, arguing that James had little opportunity to observe the shooter and that Finley's testimony was highly suspect. However, resolution of these issues of credibility fall within the jury's province. (*People* v. *Ochoa, supra*, 6 Cal.4th at p. 1206.) We decline to displace the jury as finder of fact.

### 3. *Exclusion of Evidence*

■ Johnson contends that the trial court denied him his right to confront and cross-examine by excluding evidence that Finley had testified in expectation of benefits from the police.

Our Supreme Court addressed a similar contention in *People* v. *Dyer* (1988) 45 Cal.3d 26 [246 Cal.Rptr. 209, 753 P.2d 1]. In *Dyer*, the defendant wished to cross-examine two witnesses about charges against the witnesses in matters unrelated to the defendant's trial, seeking to show that their testimony against the defendant would secure help from the police in the unrelated matters. (*Id.* at pp. 44-45.) During in camera hearings, the witnesses denied any connection between their testimony and the unrelated charges, and these denials were corroborated by other evidence. (*Id.* at p. 48.) The trial court excluded the proposed cross-examination. (*Id.* at pp. 44-46.) ·

The court in *Dyer* held that the trial court's rulings did not constitute reversible error, reasoning, inter alia, that insofar as the defendant's confrontation rights were concerned, the trial court had wide discretion to limit cross-examination on the grounds of marginal relevance. (*People* v. *Dyer*, *supra*, 45 Cal.3d at p. 48.) While acknowledging "the well established principle that the defense is entitled to elicit evidence that a witness is motivated by an expectation of leniency or immunity [citations]," the court stated that "[i]n the absence of proof of some agreement which might furnish a bias or motive to testify against defendant, the fact that each witness had been charged with the commission of unrelated offenses was irrelevant." (*Id.* at pp. 49-50.)[4]

Here, Johnson sought to cross-examine Finley on Finley's prior relationship with the police, and especially with Los Angeles Police Department Detective Thomas Mathew, who was the investigating officer responsible for the case. Johnson's request involved four unrelated matters: (1) Finley's arrest in October 1993 on charges of burglary, later dismissed; (2) Finley's arrest in late 1993 on charges of auto theft, and his subsequent plea of guilty to tampering with auto parts; (3) Finley's conviction in 1995 for auto theft, and his subsequent placement on probation; and (4) a federal prosecution in Louisiana, in which federal authorities agreed not to indict Finley in exchange for his testimony against another individual. Johnson contended that Mathew was involved in at least three of these matters.

The trial court examined sealed portions of the court file regarding item (3), and held an in camera hearing. At the hearing, Finley denied receiving benefits from the police in any other case, and denied that the police had offered him some benefit for his testimony in the present case.

With respect to items (1) and (2), Finley testified that no one discussed the present case with him when the cases were resolved. He stated that the

---

[4]The court in *Dyer* also concluded that even if limiting cross-examination was error, it was harmless beyond a reasonable doubt in view of the overwhelming and conclusive evidence against the defendant.

burglary charges were dismissed because a witness refused to come to court, and that Mathew's only involvement in the matters occurred when Finley admitted to Mathew, the investigating officer in the burglary case, that he was responsible for stealing auto tires, but not for theft of an auto.

With respect to item (3), Finley testified that three days before his current testimony, Mathew accompanied Finley to a hearing on an alleged probation violation by Finley, and Mathew explained to the hearing officer that Finley had been in federal custody and that he was also a prosecution witness in the present case. Finley stated that after he had been arrested for violating his probation, federal authorities placed him in custody in connection with item (4), and as a result, a bench warrant was issued for his arrest concerning the probation violation.

Finally, with respect to item (4), Finley stated that he was dealing with Mathew and the federal authorities in the Louisiana case in 1993, and had not given any testimony in that case, but he otherwise asserted his privilege against self-incrimination.

The trial court denied Johnson's request for cross-examination on these matters, citing the lack of evidence that Finley might receive some benefit for his testimony against Johnson, as well as the large amount of other evidence by which Johnson could impeach Finley's credibility, including his prior convictions and his suspect reference to conscience as the motive for his testimony. The trial court excluded cross-examination with respect to items (1) and (2) because they had been resolved long before Finley volunteered evidence against Johnson in the summer of 1995. The trial court excluded cross-examination on item (3), citing the lack of any indication in the case file or in Finley's testimony that he had received some benefit in connection with this item. Finally, the trial court barred cross-examination on item (4) because the evidence showed that Finley may have had an agreement in the Louisiana case to give testimony in that case, but not that Finley might obtain some benefit in the Louisiana case for his testimony against Johnson. The trial court also noted that Finley appeared to have volunteered evidence against Johnson before he was placed in custody in the Louisiana matter.

Later, the trial court permitted Johnson to cross-examine Finley about his relationship with Mathew. Finley acknowledged that he had given Mathew information against a drug dealer, but he denied that he had ever worked for Mathew.

In view of *Dyer*, we conclude that the trial court properly excluded evidence that was irrelevant. There was no error.

B. *Bento's Appeal*

After examination of the record, Bento's counsel filed an opening brief in which no issues were raised. We have examined the entire record and are satisfied that Bento's counsel has fully complied with her responsibilities and that no arguable issues exist. (*People* v. *Wende* (1979) 25 Cal.3d 436, 441 [158 Cal.Rptr. 839, 600 P.2d 1071].)

DISPOSITION

The judgments are affirmed.

Epstein, J., and Hastings, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 14, 1998.