Filed 8/27/13  P. v. Lewis CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>BRIAN LEWIS,<br><br>　　　　Defendant and Appellant. | B241490<br><br>(Los Angeles County<br>Super. Ct. No. GA082478) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Darrell Mavis, Judge.  Reversed in part, affirmed in part.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Brian Lewis appeals from his convictions of second degree robberies, burglary and petty theft with a prior. He contends there was insufficient evidence to support the convictions and the petty theft with a prior conviction must be reversed because it is a lesser included offense to the robberies. We reverse the petty theft with a prior conviction and otherwise affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by amended information with four counts of robbery, one count of petty theft with a prior and one count of burglary, all arising from the same incident occurring on December 26, 2010, at the Rite Aid on the corner of Washington and Hill in Pasadena. Defendant's first trial resulted in a mistrial after the jury was unable to reach a verdict. After a second jury convicted defendant of all charges except one of the four robberies, the trial court found true the prior conviction and prior prison term allegations. It sentenced defendant to a total of 37 years to life in prison comprised of concurrent 25 year to life terms on each of the three robbery convictions pursuant to the Three Strikes law, plus two separate five-year prior conviction enhancements (Pen. Code, § 667, subd. (a)) and two separate one-year prior prison term enhancements (Pen. Code, § 667.5, subd. (b)); sentence on the convictions for burglary and petty theft with a prior was stayed pursuant to Penal Code section 654.[2] Defendant timely appealed.

### A.    *The People's Case*

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence at defendant's second trial established that two sets of automatic doors separated by a vestibule led from the parking lot into the Rite Aid

---

[1]    The People concede that the petty theft with a prior conviction (count 5) must be reversed because it is a lesser included offense of the robberies. (*People v. Villa* (2007) 157 Cal.App.4th 1429, 1435.) We agree and reverse the conviction on count 5.

[2]    All future undesignated statutory references are to the Penal Code.

in question.  On December 26, 2010, the date of this incident, the more expensive liquor was kept in a padlocked glass cabinet on aisle eight, to which only the managers had keys.  That day, store manager Annie Matosevic, shift supervisor Tina Baron and cashiers Alejandra Salcedo and Serineh Didarloo were working.  The locked liquor cabinet was full when Matosevic walked by it at about 5:50 that morning; it was still full when she walked past it throughout the day.

### 1.       Baron Robbery (Count 2)

Baron testified that at a little past 4:30 that afternoon, she was straightening up the store from the Christmas rush when she noticed defendant and a woman in the liquor aisle.  After they declined her offer of help, Baron resumed her task in the next aisle over.  Not long after that, the woman asked Baron to take her to the hair products aisle, which Baron was about to do when something, Baron could not recall what, caused her to stop.  Moments later, Baron noticed that defendant had taken liquor out of the locked cabinet and put it into a bag, which he should not have been able to do without assistance from a store employee.  As defendant and the woman walked away from the liquor cabinet, Baron followed them and asked defendant to show her what was in his bag.  When defendant refused, Baron yelled out for Matosevic and tried to grab the bag, but defendant evaded her by tossing it over his shoulder.  Baron pursued defendant and his companion as they walked quickly towards the exit doors, all the while trying to get the bag away from him.  As Baron and defendant reached the cash registers located just before the double set of exit doors, Matosevic approached.  While Matosevic struggled with defendant for possession of the bag and other employees tried to close the front doors, Baron went to call 911.  When Baron spoke to the police later that day, she felt traumatized by the incident.  She identified defendant from a photographic lineup shown to her by the police on February 1, and in court.[3]

---

[3]       The jury found defendant not guilty of second degree robbery of Baron.

## 2.    Matosevic Robbery (Count 1)

Matosevic testified that when she went to the front of the store in response to Baron either calling Matosevic by name or yelling for someone to call 911, she saw defendant and a woman walking towards the doors leading to the vestibule. Defendant was carrying a red plastic Target bag over his shoulder, from which Matosevic could see boxes sticking out. Matosevic made contact with defendant at the check stand and asked him to give her what he had. Defendant said, "I promise to have nothing of yours." Matosevic tried to keep defendant from getting past her and through the first set of doors, but after some dodging and weaving, defendant dodged past Matosevic and into the vestibule area. When Matosevic tried to grab defendant's jacket to keep him from leaving the store, defendant threw his arm out, hitting Matosevic in the shoulder and face. At some point, defendant's plastic bag fell to the ground and some boxed bottles of Patron and a pair of bolt cutters fell out of it. As Didarloo and Salcedo were trying to close the exit doors, defendant grabbed the bag and barreled through the doors to the parking lot, causing Didarloo and Salcedo to fall. Matosevic pursued defendant but gave up the chase after he got into a car driven by the woman he had been with in the store. When Matosevic returned to the store, the boxed bottles of Patron and the bolt cutters were still on the ground in the vestibule area and her employees were already on the phone with the 911 operator. Matosevic discovered that the padlock on the glass liquor cabinet had been broken and multiple bottles of Patron, Hennessey V.S.O.P. and Remy Martin were missing from the cabinet. At the request of the police, Matosevic created a CD of the incident from the video taken by the store's surveillance cameras. Matosevic narrated the CD as it was played for the jury. Matosevic identified defendant in court, but had been unable to identify him from the photographic lineup shown to her by the police about one month after the incident.

4

### 3. Salcedo Robbery (Count 3)

Salcedo testified that she was in the cologne aisle when she heard Matosevic arguing loudly with a man. Leaning over, Salcedo was able to see Matosevic confronting defendant in front of the cash registers, about 35 or 40 feet away. As defendant tried to get past her, Matosevic asked him to show her the contents of his bag. Defendant refused, repeating, "It's not from here," several times. Salcedo moved towards the doors with the intention of keeping defendant from leaving the store and noticed Didarloo also moving in that direction. While Salcedo stood in the middle of the open doors hoping to block defendant, Didarloo was trying to close the doors. To get past Salcedo, defendant shoved her against the security gate, causing Salcedo to hit her head against the gate.[4] Salcedo tried to hang onto defendant's jacket but he pulled away and ran through the doors. After Matosevic ran after him, Salcedo noticed three bottles of Patron and a bolt cutter on the ground. Salcedo picked up the bottles and the bolt cutters to move them out of the way, but when a customer told her that the police would want those things as evidence, Salcedo put them back where they had fallen. The surveillance video was played again and Salcedo narrated it. Salcedo was not shown a photographic lineup, but she identified defendant in court.

### 4. Didarloo Robbery (Count 4)

Didarloo testified that she realized something was wrong when she heard Baron trying to stop a customer from leaving the store. She ran to tell Matosevic that Baron needed help and together they walked toward Baron. At the cash registers, Didarloo saw Baron confronting a man holding a big, red Target bag, and the man's female companion. The man was refusing Baron's repeated request that he put down the bag. As Matosevic went to assist Baron, Didarloo went to close the doors to keep the man from leaving until police arrived. Didarloo's back was to the commotion and she had almost succeeded in

---

[4] Until she saw the surveillance video, Salcedo thought she fell and hit her head on the ground.

5

getting the doors closed when she was pushed from behind, causing her face to hit the door. After the man and woman ran out of the store, Didarloo saw bolt cutters and two boxed bottles of Patron on the ground. Didarloo was not shown a photographic lineup and was unable to identify defendant in court.

Detective Robert Jenkins prepared a photographic lineup (six-pack), placing defendant's photograph in position number four. Baron identified defendant as the person she confronted in the store that day; Matosevic was not able to make an identification. Jenkins did not show the six-pack to Salcedo or Didarloo.

## B.    *The Defense Case*

When Pasadena Police Officer Richard Padilla arrived at the Rite Aid at about 4:43 p.m. that afternoon, he saw the bolt cutters and boxed bottles of Patron on the ground in the vestibule. According to Padilla's report, Baron told him that the first time she saw the Target bag it was empty and in the possession of the suspect's female companion; Baron said she saw the suspect using the bolt cutters to break the padlock on the liquor cabinet and then saw him holding the bolt cutters as he fled the store. Salcedo told Padilla that she fell and hit either her head or her back during the scuffle with defendant.

The criminalist dispatched to the scene that afternoon explained that he did not take any DNA samples because so many people had been in close proximity and even touched the relevant items, that no useful information could be gleaned. He dusted the items for latent fingerprints, but did not find any useable ones.

A DNA expert testified that, in his opinion and contrary to the testimony of the police department criminalist, useable DNA could have been obtained from the bolt cutters even though people in addition to the suspect may have also left some DNA on them.

**DISCUSSION**

*A. The Convictions Are Supported By Substantial Evidence*

Defendant contends he was denied due process and a fair trial because the convictions were not supported by substantial evidence. He argues that no physical evidence tied him to the crimes and the eyewitness identifications were not sufficient to constitute substantial evidence. We disagree.

The rules for assessing the sufficiency of the evidence are well known. "[W]e review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*Zamudio, supra*, 43 Cal.4th at pp. 357-358.)

It is well settled that a single eyewitness's identification of the defendant as the perpetrator may be sufficient to sustain a conviction. (*People v. Boyer* (2006) 38 Cal.4th 412, 480; see also Evid. Code, § 411 ["[e]xcept where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"]; and see *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["unless the

7

testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].)

Here, Baron identified defendant from the six-pack and at trial. Matosevic was unable to identify defendant from the six-pack but did so in court. Salcedo was not shown the six-pack but identified defendant in court. These three eyewitness identifications constitute substantial evidence to support the convictions. As we shall explain, we are not persuaded otherwise by defendant's argument that these identifications were unreliable under the circumstances.

B.      *Identifications From the Photographic Lineup Were Not Unreliable*

Defendant concedes that trial counsel's failure to object to the pretrial identification procedure constitutes a forfeiture of the issue on appeal (*People v. Elliot* (2012) 53 Cal.4th 535, 585-586), but urges us to consider the suggestive nature of the lineup in analyzing the sufficiency of the evidence. He argues that Baron's pretrial and subsequent in-court identifications of defendant do not constitute substantial evidence because defendant stood out as the only person in the six-pack depicted wearing a jacket.[5] We disagree.

" 'Because human beings do not look exactly alike, differences are inevitable. The question is whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 943.) In *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222, our Supreme Court held that a photographic lineup was not unduly suggestive where witnesses described the perpetrator as wearing a red jacket and the defendant was the only person in the lineup wearing a red shirt.

Here, the witnesses said the perpetrator was wearing a black puffy jacket. In the six-pack shown to Baron, five of the six people are wearing T-shirts of varying colors and

---

[5]      In a separate Petition for Habeas Corpus Relief, defendant argues that his trial counsel was ineffective for failing to object to the photographic lineup. By separate order we summarily deny defendant's habeas petition.

only defendant is wearing what appears to be a hooded jacket or sweatshirt.[6]  Under *DeSantis*, the difference in clothing did not make defendant stand out in a way that suggested the witnesses should select him; nor was evidence insufficient because of the unreliability of the identification.

*C.     The In-Court Identifications Were Not Inherently Unreliable*

Defendant contends none of the in-court identifications constitute substantial evidence because the witnesses had little time to observe the perpetrator and the procedure of having a witness identify the defendant who is seated at a table with counsel is inherently suspect.  In particular, he challenges Matosevic's in-court identification on the ground that she failed to identify him from the six-pack.  We disagree.

Defendant's challenge to the in-court identifications based on the witnesses' ability to observe the perpetrator involves issues of credibility, resolution of which fall squarely within the jury's province.  (*People v. Bento* (1998) 65 Cal.App.4th 179, 193.)  Likewise, his challenge to the unreliable nature of the in-court identification process is a matter that may be argued to the jury, but does not make the identification insufficient as a matter of law.  (*People v. Breckenridge* (1975) 52 Cal.App.3d 913, 935.)  Finally, as to Matosevic's failure to identify defendant from the six-pack, it is well settled that the failure to make an identification from a photograph goes to the weight of the in-court identification, not its sufficiency.  (*People v. Prado* (1982) 130 Cal.App.3d 669, 673, overruled on other grounds by *People v. Howard* (1992) 1 Cal.4th 1132, 1175; see also *People v. Contreras* (1993) 17 Cal.App.4th 813, 822-823 [witness's failure to identify defendant in photographic lineup does not render a subsequent in-court identification inadmissible; weight to be given the identification under such circumstances is for the jury to decide].)

---

**6**     A black and white photocopy of the six-pack is attached as Exhibit A to defendant's Petition for Habeas Corpus.

9

## DISPOSITION

The conviction on count 5 is reversed.  In all other respects, the judgment is affirmed.


                                        RUBIN, J.

WE CONCUR:



        BIGELOW, P. J.



        GRIMES, J.